STATE OF _Louisiana_

PARISH/COUNTY OF _Terre bonne_

## GUARANTY

THIS GUARANTY ("Guaranty") is made and executed this _13th_ day of _July_, 20_06_, by the following individual(s):

_Micheal A Tolliver_, who resides at _103 micheal_ ;

_Vincent E Tolliver_, who resides at _103 micheal_ ; and

_____, who resides at _____
(hereinafter individually and collectively referred to as "Guarantor"),

in order to induce Hill City Oil, Inc. ("Lessor") to enter into a lease agreement ("Lease") with _Tolliver Enternational Holding Corp_ ("Lessee") with an effective date the same day this Guaranty is executed ("Effective Date") and to which this Guaranty is attached.

Guarantor hereby covenants and agrees that for and in consideration of the execution of the Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantor hereby jointly, severally, in solido, unconditionally and irrevocably guarantees the prompt payment by Lessee of all monies and all other sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee, all as is defined and set forth in said Lease.

It is specifically agreed and understood that the terms of the foregoing Lease may be altered, affected, modified or changed by agreement between Lessor and Lessee, or by a course of conduct. It is understood that said Lease may not be assigned by Lessor or any assignee of Lessor without the express consent of Lessee, subject to Lessee's sole discretion.

This Guaranty shall not be released, modified or affected by failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need be given to Guarantor, it being specifically agreed and understood that the guarantee of the undersigned is a continuing guarantee during the period stated above under which Lessor may proceed forthwith and immediately against Lessee or against Guarantor following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee pursuant to or under the terms of the Lease or at law or in equity.

Guarantor hereby waives (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) any right to require the Lessor to proceed against the Lessee,

The obligations of the Guarantor hereunder shall include payment to Lessor of all reasonable costs of any successful legal action by Lessor against Guarantor, including reasonable attorney fees.

**THUS DONE AND PASSED**, in parish and state first mentioned above, on the Effective Date, in the presence of the undersigned competent witnesses, and after due reading of the whole.

WITNESSES:

BY: _____

BY: _____

WITNESSES:

BY: _____

GUARANTOR:

BY: _Tolliver International Holding Corp_

Print Name: _Micheal A Tollier_

GUARANTOR:

BY: _Tolliver International Holding Corp_

Print Name: _Vincent E. Tolliver_

ACCEPTED BY LESSOR

BY: _____

1

STATE OF _Louisiana_

PARISH/COUNTY OF _Terre bonne_

## GUARANTY

**THIS GUARANTY** ("Guaranty") is made and executed this _13th_ day of _July_, 20_06_, by the following individual(s):

_Micheal Tolliver_, who resides at _103 micheal_;

_Vicnente Tolliver_, who resides at _103 micheal_; and

_____, who resides at _____
(hereinafter individually and collectively referred to as "Guarantor"),

in order to induce Hill City Oil, Inc. ("Lessor") to enter into a lease agreement ("Lease") with _Tolliver International Holding Corp_ ("Lessee") with an effective date the same day this Guaranty is executed ("Effective Date") and to which this Guaranty is attached.

Guarantor hereby covenants and agrees that for and in consideration of the execution of the Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantor hereby jointly, severally, in solido, unconditionally and irrevocably guarantees the prompt payment by Lessee of all monies and all other sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee, all as is defined and set forth in said Lease.

It is specifically agreed and understood that the terms of the foregoing Lease may be altered, affected, modified or changed by agreement between Lessor and Lessee, or by a course of conduct. It is understood that said Lease may not be assigned by Lessor or any assignee of Lessor without the express consent of Lessee, subject to Lessee's sole discretion.

This Guaranty shall not be released, modified or affected by failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need be given to Guarantor, it being specifically agreed and understood that the guarantee of the undersigned is a continuing guarantee during the period stated above under which Lessor may proceed forthwith and immediately against Lessee or against Guarantor following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee pursuant to or under the terms of the Lease or at law or in equity.

Guarantor hereby waives (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) any right to require the Lessor to proceed against the Lessee,

The obligations of the Guarantor hereunder shall include payment to Lessor of all reasonable costs of any successful legal action by Lessor against Guarantor, including reasonable attorney fees.

**THUS DONE AND PASSED**, in parish and state first mentioned above, on the Effective Date, in the presence of the undersigned competent witnesses, and after due reading of the whole.

**WITNESSES:**

BY: _____

BY: _____

**WITNESSES:**

BY: _____

**GUARANTOR:**

BY: _Tolliver International Holding Corp_
Print Name: _Micheal Tolliver_

**GUARANTOR:**

BY: _Tolliver International Holding Corp_
Print Name: _Vincent E. Tolliver_

**ACCEPTED BY LESSOR**

BY: _____

1

STATE OF _Louisiana_

PARISH/COUNTY OF _Terrebonne_

## GUARANTY

THIS GUARANTY ("Guaranty") is made and executed this _13th_ day of _July_, 20_06_, by the following individual(s):

_Micheal A Tolliver_, who resides at _103 micheal_ ;

_Vicnent E Tolliver_, who resides at _103 micheal_ ; and

_____, who resides at _____
(hereinafter individually and collectively referred to as "Guarantor"),

in order to induce Hill City Oil, Inc. ("Lessor") to enter into a lease agreement ("Lease") with _Tolliver Entirnational Holdin Orrp_ ("Lessee") with an effective date the same day this Guaranty is executed ("Effective Date") and to which this Guaranty is attached.

Guarantor hereby covenants and agrees that for and in consideration of the execution of the Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantor hereby jointly, severally, in solido, unconditionally and irrevocably guarantees the prompt payment by Lessee of all monies and all other sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee, all as is defined and set forth in said Lease.

It is specifically agreed and understood that the terms of the foregoing Lease may be altered, affected, modified or changed by agreement between Lessor and Lessee, or by a course of conduct. It is understood that said Lease may not be assigned by Lessor or any assignee of Lessor without the express consent of Lessee, subject to Lessee's sole discretion.

This Guaranty shall not be released, modified or affected by failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need be given to Guarantor, it being specifically agreed and understood that the guarantee of the undersigned is a continuing guarantee during the period stated above under which Lessor may proceed forthwith and immediately against Lessee or against Guarantor following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee pursuant to or under the terms of the Lease or at law or in equity.

Guarantor hereby waives (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) any right to require the Lessor to proceed against the Lessee,

The obligations of the Guarantor hereunder shall include payment to Lessor of all reasonable costs of any successful legal action by Lessor against Guarantor, including reasonable attorney fees.

THUS DONE AND PASSED, in parish and state first mentioned above, on the Effective Date, in the presence of the undersigned competent witnesses, and after due reading of the whole.

WITNESSES:

BY: _____

BY: _____

WITNESSES:

BY: _____

GUARANTOR:

BY: _Tolliver Nternational Holdg corp_

Print Name: _Micheal A Tollie_

GUARANTOR:

BY: _Tolliver Nternational Holdg corp_

Print Name: _Vinact E. Tolliver_

ACCEPTED BY LESSOR

BY: _____

1

STATE OF _Louisiana_

PARISH/COUNTY OF _Terrebonne_

## GUARANTY

THIS GUARANTY ("Guaranty") is made and executed this _13th_ day of _July_, 20_06_, by the following individual(s):

_Micheal A Tolliver_, who resides at _103 micheal_;

_Vicnent E Tolliver_, who resides at _103 micheal_; and

_____, who resides at _____
(hereinafter individually and collectively referred to as "Guarantor"),

in order to induce Hill City Oil, Inc. ("Lessor") to enter into a lease agreement ("Lease") with _Tolliver International Holding Corp_("Lessee") with an effective date the same day this Guaranty is executed ("Effective Date") and to which this Guaranty is attached.

Guarantor hereby covenants and agrees that for and in consideration of the execution of the Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantor hereby jointly, severally, in solido, unconditionally and irrevocably guarantees the prompt payment by Lessee of all monies and all other sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee, all as is defined and set forth in said Lease.

It is specifically agreed and understood that the terms of the foregoing Lease may be altered, affected, modified or changed by agreement between Lessor and Lessee, or by a course of conduct. It is understood that said Lease may not be assigned by Lessor or any assignee of Lessor without the express consent of Lessee, subject to Lessee's sole discretion.

This Guaranty shall not be released, modified or affected by failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need be given to Guarantor, it being specifically agreed and understood that the guarantee of the undersigned is a continuing guarantee during the period stated above under which Lessor may proceed forthwith and immediately against Lessee or against Guarantor following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee pursuant to or under the terms of the Lease or at law or in equity.

Guarantor hereby waives (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) any right to require the Lessor to proceed against the Lessee,

The obligations of the Guarantor hereunder shall include payment to Lessor of all reasonable costs of any successful legal action by Lessor against Guarantor, including reasonable attorney fees.

THUS DONE AND PASSED, in parish and state first mentioned above, on the Effective Date, in the presence of the undersigned competent witnesses, and after due reading of the whole.

WITNESSES:

BY: _____

BY: _____

WITNESSES:

BY: _____

GUARANTOR:

BY: _Tolliver International Holding Corp_
Print Name: _Micheal A Tollie_

GUARANTOR:

BY: _Tolliver International Holding Corp_
Print Name: _Vincent E. Tollien_

ACCEPTED BY LESSOR

BY: _____

1

STATE OF _Louisiana_

PARISH/COUNTY OF _Terrebonne_

## GUARANTY

**THIS GUARANTY** ("Guaranty") is made and executed this _13th_ day of _July_, 20 _05_, by the following individual(s):

_William - McFarland_, who resides at _1508 South 9th Street_;

_____, who resides at _____ ; and

_____, who resides at _____
(hereinafter individually and collectively referred to as "Guarantor"),

in order to induce Hill City Oil, Inc. ("Lessor") to enter into a lease agreement ("Lease") with _Tolliver International Honda Corp_ ("Lessee") with an effective date the same day this Guaranty is executed ("Effective Date") and to which this Guaranty is attached.

Guarantor hereby covenants and agrees that for and in consideration of the execution of the Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantor hereby jointly, severally, in solido, unconditionally and irrevocably guarantees the prompt payment by Lessee of all monies and all other sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee, all as is defined and set forth in said Lease.

It is specifically agreed and understood that the terms of the foregoing Lease may be altered, affected, modified or changed by agreement between Lessor and Lessee, or by a course of conduct. It is understood that said Lease may not be assigned by Lessor or any assignee of Lessor without the express consent of Lessee, subject to Lessee's sole discretion.

This Guaranty shall not be released, modified or affected by failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need be given to Guarantor, it being specifically agreed and understood that the guarantee of the undersigned is a continuing guarantee during the period stated above under which Lessor may proceed forthwith and immediately against Lessee or against Guarantor following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee pursuant to or under the terms of the Lease or at law or in equity.

Guarantor hereby waives (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) any right to require the Lessor to proceed against the Lessee,

The obligations of the Guarantor hereunder shall include payment to Lessor of all reasonable costs of any successful legal action by Lessor against Guarantor, including reasonable attorney fees.

**THUS DONE AND PASSED**, in parish and state first mentioned above, on the Effective Date, in the presence of the undersigned competent witnesses, and after due reading of the whole.

WITNESSES:

BY: _____

BY: _____

WITNESSES:

BY: _____

GUARANTOR:

BY: _____
Print Name: _William McFarland_

GUARANTOR:

BY: _____
Print Name: _____

ACCEPTED BY LESSOR

BY: _____

1

STATE OF _Louisiana_

PARISH/COUNTY OF _Terre bonne_

## GUARANTY

THIS GUARANTY ("Guaranty") is made and executed this _13th_ day of _July_, 20_05_, by the following individual(s):

_Willa - McFarland_, who resides at _1508 South 9th Street_;

_____, who resides at _____; and

_____, who resides at _____

(hereinafter individually and collectively referred to as "Guarantor"),

in order to induce Hill City Oil, Inc. ("Lessor") to enter into a lease agreement ("Lease") with _Tolliver International Honda Corp_ ("Lessee") with an effective date the same day this Guaranty is executed ("Effective Date") and to which this Guaranty is attached.

Guarantor hereby covenants and agrees that for and in consideration of the execution of the Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantor hereby jointly, severally, in solido, unconditionally and irrevocably guarantees the prompt payment by Lessee of all monies and all other sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee, all as is defined and set forth in said Lease.

It is specifically agreed and understood that the terms of the foregoing Lease may be altered, affected, modified or changed by agreement between Lessor and Lessee, or by a course of conduct. It is understood that said Lease may not be assigned by Lessor or any assignee of Lessor without the express consent of Lessee, subject to Lessee's sole discretion.

This Guaranty shall not be released, modified or affected by failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need be given to Guarantor, it being specifically agreed and understood that the guarantee of the undersigned is a continuing guarantee during the period stated above under which Lessor may proceed forthwith and immediately against Lessee or against Guarantor following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee pursuant to or under the terms of the Lease or at law or in equity.

Guarantor hereby waives (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) any right to require the Lessor to proceed against the Lessee,

The obligations of the Guarantor hereunder shall include payment to Lessor of all reasonable costs of any successful legal action by Lessor against Guarantor, including reasonable attorney fees.

THUS DONE AND PASSED, in parish and state first mentioned above, on the Effective Date, in the presence of the undersigned competent witnesses, and after due reading of the whole.

WITNESSES:

BY: _____

BY: _____

WITNESSES:

BY: _____

GUARANTOR:

BY: _____

Print Name: _Willia McFarland_

GUARANTOR:

BY: _____

Print Name: _____

ACCEPTED BY LESSOR

BY: _____

1

GOODWILL PAYMENT AGREEMENT

Date: _07/13/2005_

     This Goodwill Payment Agreement ("Agreement") is made and entered into on the _13th_ day of ___July___, 20_05_, and in connection with a Lease Agreement ("Lease") of that certain immovable property located at **1001 Broadway, Delhi, Louisiana**. **Hill City Oil Company, Inc.**, a Mississippi corporation, whose address is 1409 Dunn Street, Houma, LA 70360 ("Lessor"); and **Tolliver International Holding Corp.**, represented by William McFarland, Michael Tolliver and Vincent Tolliver, whose address is _P.O. Box 67 Monroe, LA 71201_ ("Lessee"), hereby agree, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as follows:

1.    Lessee agrees to pay Lessor a goodwill payment of seventy thousand dollars and no/00 ($70,000.00), $35,000 to be paid in cash at execution of this agreement and the remainder to be paid in 2 installments of $17,500, the first being due on the 15th Day of August, 2005 and the second being due on the 15th day of September, 2005.

**WITNESSES:**

**BY:** _____

**BY:** _William McFarland_

**WITNESSES:**

**BY:** _____

**WITNESSES:**

**BY:** _____

**BY:** _____

**WITNESSES:**

**BY:** _____

**LESSOR:**

**BY:** _____

**Print Name:** _____

**LESSEE:**

**BY:** _Tolliver International Holding Corp_

**Print Name:** _Vincent E Tolliver_

STATE OF LOUISIANA

PARISH OF TERREBONNE

## LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") is made and entered into on the *13ᵗʰ* day of *July*, 2005 by and between Hill City Oil Company, Inc., a Mississippi corporation, whose address is 1409 Dunn Street, Houma, LA 70360 ("Lessor"); and Tolliver International Holding Corp., represented by William McFarland, Michael Tolliver and Vincent Tolliver, whose address is *P.O. Box 67 Monroe, LA 71201* ("Lessee"), who for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby agree as follows:

### WITNESSETH

WHEREAS, Lessee desires to operate a convenience store business ("Lessee's Store Operations") upon the Premises at which location Lessee will exclusively sell Lessor's motor fuels on a consignment basis ("Lessee's Motor Fuel Operations"). Collectively Lessee's Store Operations and Lessee's Motor Fuel Operations shall be referred to as "Lessee's Business Operations"; and

WHEREAS, Lessor currently engages in, among other things, the supply of branded and unbranded motor fuel for retail sale to consumers ("Lessor's Motor Fuel Operations"); and

WHEREAS, Lessee will derive substantial revenue and profits from Lessee's Store Operations, with Lessee's Store Operations being separate, apart and distinct from Lessee's Motor Fuel Operations and Lessor's Motor Fuel Operations (hereinafter they shall collectively be referred to as "Motor Fuel Operations"); and

NOW THEREFORE, for and in consideration of the mutual covenants herein, the parties agree to the following:

1. **PREMISES.**

   a. Lessor hereby agrees to lease to Lessee that certain immovable property located at **1001 Broadway, Delhi, Louisiana** , including but not limited to all buildings, improvements, storage tanks, dispensing facilities, fixtures, appurtenances, and equipment located thereon (hereinafter individually and collectively referred to as the "Premises"), save and except the following:

      1. _____

      2. _____

   b. Lessee hereby acknowledges that the Premises leased herein are received in good and safe conditions, and that Lessee is familiar with the safe operation of the same. During the term of this Lease, Lessee shall have the right to possess and use the Premises subject to its compliance with the conditions, obligations, and duties set forth herein and, further, subject to the rights of the Lessor provided herein or otherwise provided by law. Lessor expressly reserves and retains an unrestricted right and easement/servitude in and to the Premises for the purpose of installing, maintaining and servicing the Premises and to conduct periodic inspections of Motor Fuel Operations. However, this right shall in no way limit or exonerate Lessee from its obligation to completely maintain the Premises in a good and safe condition.

2. **TERM OF LEASE.** The initial term of this Lease shall be for ten (10) years (the "Primary Term"), beginning on the 1ˢᵗ day after approval by the U.S. Bankruptcy Court (the "Effective Date"). The term of this Lease may be extended for one additional term of five (5) years ("Extended Term"), said extension, if applicable, to be at the monthly Rental hereafter set forth, and otherwise to be on the same terms, covenants, and conditions as herein provided.

3. **AUTOMATIC EXTENSION.** It is agreed that the Primary Term shall be automatically extended for the first Extended Term and the first Extended Term shall be automatically extended for the next Extended Term (as the case may be), unless on or before thirty (30) days before the expiration of the Primary Term or respective Extended Term (as the case may be), either party provides to the other party written Notice of its intent not to automatically extend the term then in effect.

4. **ANCILLARY CONTRACTS.** The parties mutually acknowledge that, as checked-off below, they have entered into or are otherwise bound by the following additional ancillary agreements (sometimes collectively and individually referred to as "Ancillary Agreements") concurrently with the execution of this Lease. The terms of each Ancillary Agreement impose additional rights and duties on both the Lessor and Lessee. The terms and conditions of each Ancillary Agreement are incorporated herein and made a part hereof. Should there be any conflict between this Lease and the terms of any Ancillary Agreement, the terms of this Lease shall govern.

   ☒ *Motor Fuel Sales Management Agreement* with regard to consigned sale by Lessee of Lessor's motor fuel;

   ☒ *Jubilee Proprietary Mark Agreement* with regard to the use by Lessee of intellectual property owned by Lessor in connection with Lessee's Business Operations and the marketing of Lessor's motor fuel;

   ☒ *Lessee Goodwill Payment* with regard to the payment of monies by a Lessee to Lessor, under either verbal or written agreement, for the benefit to Lessee's Business Operations;

   ☐ *Additional Lease(s)* with regard to the Lessee leasing additional real estate and/or equipment by Lessor.

   ☒ *Third Party Vendor Agreements* with regard to third party vendors that supply merchandise to Lessee's Store Operations, either under a verbal or written agreement, for eventual consumer retail sale.

      i. Imperial Trading

      ii. Coca-Cola

      iii. Mr. Freeze

      iv. Community Coffee
      v. ETM
      vi. Slow Melt Ice, Inc.

   ☐ *Other:* _____

Consigned Lease/PMPA not applicable

5. **RENT & MONTHLY CHARGES.**

   a.  During the Principal Term of this Lease, Lessee shall pay rent for years 1 through 5 of $7,000.00 per month, which amount shall be increased by 7.5% for years 6 through 10 ("Rent"), all said Rent being payable in advance by Lessee to Lessor at P.O. Box 4036, Houma, LA 70361, on or before the fifth day of each month. Payment of Rent may be tendered by cash, ACH or draft. Lessee acknowledges that this Rent amount specifically contemplates the Lessee bearing expenses related to Lessee obligations relevant to this Lease or any Ancillary Agreements. The failure by Lessee to timely pay an Rent due shall subject such delinquent Rent to interest at a rate of one and one half percent (1 1/2 %) per month from the date due until paid.

   b.  During the first Extended Term, the Rent for years 6 through 10 shall be increased by 7.5%.

   c.  In addition to the Rent, Lessee agrees to pay, and abide by all respective terms, conditions and obligations that apply in the following additional monthly fees and/or charges with respect to various services, equipment, foodstuff, supplies and inventory supplied to Lessee's Store Operations:

| Item: | Monthly Charges: |
|---|---|
| i.   Chevron EPOS | $ 299.00 |
| ii.   Mr. Freeze | $ 259.00 |
| iii. _____ | $_____ |
| iv. _____ | $_____ |
| v. _____ | $_____ |

6. **USE OF PREMISES.**

   a.  Lessee agrees to use the Premises solely for the purposes of (i) providing Motor Fuel Operations; (ii) Lessee's Store Operations; and (iii) other uses reasonably incidental thereto (collectively referred to herein as "Use"). It is expressly agreed that the Lessee shall neither use the Premises, nor conduct any activities upon the Premises, that will disrupt, interfere, or otherwise impair the consigned sale by Lessee of Lessor's motor fuel. This includes, without limitation, conducting activities that are hazardous to or threaten public safety, especially when done in close proximity to motor fuel products.

   c.  Lessor expressly reserves and retains an unrestricted easement/servitude in and to the Premises for the purposes of installing, maintaining, and servicing the Premises or any activity in furtherance of Motor Fuel Operations, as well to enter the Premises at any time for the purpose of taking any measurements or making any inspections or readings Lessor is entitled to or desires under this or any Ancillary Agreement. Lessee further acknowledges that Lessor retains the right to use appropriate signage, including the language to be contained thereon, and brand identifications on the Premises in connection with Motor Fuel Operations.

   d.  The parties acknowledge that Lessee's Business Operations is independent of and distinct from the Lessor's Motor Fuel Operations, which respective rights and obligations are more fully set forth in this Lease and Ancillary Agreements.

   d.  Lessee shall not place any buildings, signs or any permanent improvements on the Premises, or remove or make any alterations or changes to the Premises without the prior written permission of the Lessor. No obstructions to the entrances or exits, pump islands, or service areas of the Premises shall be allowed to exist whereby the public or delivery vehicles might be denied free access to the facilities. No cars for sale, boats for sale, or motor homes shall be parked on the Premises, except for those belonging to customers currently transacting business.

   e.  Lessee acknowledges and agrees that as of the Effective Date the Premises are in good order and condition. Lessee agrees, at its cost, to keep the entirety of the Premises in good repair and Lessee will not allow any injuries or damage thereto. Lessee further agrees not to use, occupy or permit the use or occupancy of the Premises for any purpose which is forbidden by law, ordinance, or governmental or municipal regulation or order, or permit the maintenance of any public or private nuisance.

   f.  Lessee will not use or permit on the Premises anything that will invalidate the policies of insurance nor or hereafter carried on the Premises, or that will increase the rate of insurance on the Premises.

7. **LESSEE'S MAINTENANCE, REPAIR & OPERATIONS OBLIGATIONS.** Lessor and Lessee expressly acknowledge the mutual benefit from the efficient, businesslike operations of all permitted Uses conducted upon the Premises. To promote this mutual benefit, Lessee agrees to timely and fully perform the following at its sole cost and expense:

   a.  Use its best efforts to diligently promote the sale of Lessor's motor fuel products and to purchase from Lessor any agreed minimum monthly amounts. This also includes Lessee using its best efforts to merchandise and market all products sold to it by Lessor. Lessee further agrees to keep the Premises open for business, properly illuminated, and adequately staffed by qualified personnel, twenty-four (24) hours per day, seven (7) days per week.

   b.  Repair and maintain the building and restrooms in a clean, sanitary, adequately supplied and well-lit condition to meet all public health requirements.

   c.  Aside from the canopy, and motor fuel equipment, motor fuel storage and dispensing equipment, make all structural repairs, provide all major painting, and maintain all driveways, waste cans, paved areas, roofs and other surrounding areas on or around Premises in good working order, consistent with industry standards and/or Brand standards, and free from dirt and debris.

   d.  Keep the general office area and other working areas of the Premises well-lit, organized and clean during all hours of operation.

   e.  Repair and maintain the air conditioning/heating ("HVAC") system of the Premises and any walk-in coolers. This also includes routine operation of the HVAC system to control in-store humidity levels, and ensure that in-store temperatures are consistent with industry practice and promote the image of all marks used in connection with Business Operations upon the Premises.

   f.  Insure that all personnel employed by the Lessee are adequately supervised, trained, courteous, and neat in appearance so as to best serve the needs and desires of the motoring public.

Consigned Lease/PMPA not applicable

g. Maintain lighting (including yard lights) and signage (including but not limited to motor fuel sales related signage and posting of fuel sale prices) with regard to Lessee's Store Operations, and Business Operations on the Premises in good working order, consistent with industry standards, and free from dirt and debris. Lessee However, Lessor shall be responsible for maintaining price product signs.

h. Retain the third party professional services with regard to the cutting and maintenance of yards, lawns, trees and shrubs on or surrounding the Premises, unless otherwise agreed to by Lessor in writing.

i. Maintain all in-store equipment, including but not limited to walk-in coolers.

j. Maintain any car wash located upon the Premises, including but not limited to the furnishing of all chemicals, soaps and waxes related thereto.

k. Pay all monies due and to take all required action with respect to licensure, permitting or fees required in connection with Lessee's Store Operations and Lessee's Motor Fuel Operations.

l. Pay all state and local taxes assessed against Lessee's personal property on the Premises or against Lessee for the conduct of its business operations upon the Premises.

m. Pay all water, gas, electricity, telephone, and any other utility charges of any sort relating to the Premises, the sale of Lessor's motor fuel, or Lessee's Business Operations. This includes establishing all utilities in the name of and with a billing address for Lessee or Lessee's agent .

n. Provide immediate notice to Lessor of any damage to the Premises caused by fire or other casualty.

o. Provide immediate notice to Lessor of any claims by retail consumers of Lessor's motor fuel with regard to an alleged vice, defect or variance in quality, in which case Lessee shall retain all records and documentation with regard to the allegations and which may prove or disprove such allegations.

p. Lessee shall promptly respond (in writing if requested by Lessor) to any inquiries or complaints received by Lessor or Lessee in connection with Lessee's Motor Fuel Operations or Lessor's Motor Fuel Operations and take reasonable action to correct or satisfactorily resolve each such inquiry or complaint. If in Lessor's judgment Lessee fails to adequately respond to and correct or resolve customer inquiries or complaints, Lessor shall have the right but not the obligation to resolve such matters directly with customer, at Lessee's expense.

q. Any Rent and monies due hereunder by Lessee, if unpaid, shall be assessed a monthly interest of one half percent (1 $\frac{1}{2}$%) per month until paid.

r. Unless otherwise provided for herein, remit to Lessor all receipts and documentation with respect to Lessee's Business Operations as requested by Lessor within the time frame specified by Lessor.

s. For the purpose of quality control and preserving Lessor's Proprietary Mark, Lessee agrees during the Term of this Lease and an extensions thereof to exclusively purchase merchandise, inventory, and supplies customarily sold at convenient stores from vendors selected by Lessor and pursuant to the terms and conditions of agreements between HCO and said vendors, as amended from time-to-time, and at prices that are reasonable and consistent with customary, industry mark-up rates.

8. **LESSOR'S REPAIR, MAINTENANCE & OPERATIONS OBLIGATIONS.** Lessor agrees to timely and fully perform the following at its sole cost and expense:

a. Repair and maintain the canopy and all motor fuel equipment, storage and dispensing equipment in good and operable condition, unless such damage is due to the negligence of Lessee or Lessee's employees.

b. Maintain price product signs.

c. Pay the costs of any license fee necessary for the operation of Lessor's Motor Fuel Operations.

d. Pay all taxes assessed against the Lessor's Motor Fuel Operations.

9. **TAXES.** With regard to taxes that may be assessed during the Primary Term or any Extended Term of this Lease, with regard to the land, or any improvements made to it, ad valorem taxes, or any of Lessor's equipment situated, located or affixed to the Premises ("Taxes"), Lessor and Lessee agree that payment of the Taxes shall be prorated with Lessor paying twenty-five percent (25%) and Lessee paying seventy-five percent (75%). Lessor shall present to Lessee at least annually with a statement of Taxes, which sum shall be paid within ten (10) days of Lessee's receipt. If the Lease's Effective Date or termination date is a day other than January 1, the amount of Taxes shall be prorated based on the number of days in such year prior to the Effective Date or termination date and the number of days after the Effective Date or termination date.

10. **BRAND IDENTIFICATION.**

a. Lessee acknowledges and agrees that Lessor retains exclusive discretion with regard to the branding of motor fuel marketed upon the Premises or otherwise sold as part of Motor Fuel Operations.

b. Lessor retains exclusive discretion with regard to the painting design and colors applied to the buildings, structures, equipment, or fixtures located on or affixed to the Premises, and Lessee agrees that it shall not changed same without the prior written consent of Lessor.

c. Lessee acknowledges that Lessor may participate in an image program in connection with brand motor fuel sold as part of Motor Fuel Operations upon the Premises. Lessee agrees to maintain the Premises under the guidelines set forth in said branded program. Included under the guidelines, as set forth by Lessor's supplier, the Lessee and Lessee's employees hereby agree to wear the supplier's nationally approved uniform and to participate in supplier's branded promotions at Lessee's expense, as these promotions become available.

d. Within ten (10) days of receipt, Lessee expressly agrees to display all Branded POS signs, displays and trade dress, and at the same time to remove all out-of-date signs, displays and trade dress that is being replaced.

11. **IMPROVEMENTS.** It is specifically understood and agreed that Lessor reserves the right to make improvements to the location, including the replacement and/or renovation of the pumps and canopy, and Lessee acknowledges that such renovations or improvements may temporarily cause a cessation of motor fuel sales, and may temporarily impede the Use of the all or a portion of the Premises. In such event, Lessee shall not be entitled to any compensation from Lessor.

12. **INSURANCE.**

a. **Insurance Maintained by Lessee.** Lessor and Lessee acknowledge their separate insurable interests relating to their independent business operations located on the Premises. For this reason, Lessee shall maintain in full force and effect on and after the Effective Date the following insurance:

3

i. Insurance on personal property, equipment and inventory located on the Premises owned or leased by Lessee or Lessor or which pertains to Lessee's Business or where Lessee is acting in a bailee or trustee capacity with coverage for the full replacement value.

ii. Insurance on the Premises for its full insurable value against loss or damage by all perils covered by an "all risks" insurance policy of the type generally available, provided that if such an all risks insurance policy is not generally available, then Lessee shall maintain insurance on the Premises against loss or damage by fire and against loss or damage by any other risk now and from time to time insured against by "extended coverage" provisions of policies generally available.

iii. Comprehensive general liability insurance, with limits of not less than $1 million with respect to bodily injury or death to any number of persons in any one accident or occurrence and $1 million with respect to property damage in any one accident or occurrence.

iv. Environmental pollution casualty and liability coverage with limits of not less than $1 million per event or occurrence and $1 million with respect to property damage in any one accident or occurrence.

v. Business interruption insurance with coverage for at least six (6) months of Rent.

v. Worker's compensation insurance covering all persons employed by Lessee for such work and with respect to whom death or bodily injury claims could be asserted against Lessee, Lessor or the Premises.

vi. To the extent the Premises are located in a special flood hazard Zone A, insurance against flood, such insurance to be not less than 100% of the full replacement cost of the Premises or the maximum amount available, whichever is greater.

Each of the insurance policies referred to in this Section shall provide (if such provision is obtainable) that it shall not be canceled or its coverage reduced without at least thirty (30) days prior written notice to Lessor and Lessee. In addition, each liability insurance policy referred to in this Section shall name Lessor as an additional assured, and each property insurance policy referred to in this Section shall contain (if such provisions are obtainable) waiver of subrogation provisions pursuant to which the insurer waives all express and implied rights of subrogation against Lessor. All insurance required of Lessee pursuant to this Section shall be original paid-up insurance policies and shall be issued by companies authorized to conduct business in the state of Louisiana and having a Best Insurance Guide rating of A- or higher. For all insurance policies referred to in this Section, Lessee shall name Lessor as a named additional assured and provide Lessor with a certificate evidencing coverage.

b. **Subrogation.** Lessee shall make no claim for recovery against Lessor and expressly waives its right of recovery for damage to or loss of the Premises and contents therein, when such damage or loss may arise by fire or any other peril covered by any policy of insurance in which Lessee is or may be the assured and when said loss is caused by or results from any acts of carelessness or negligence of Lessee, its agents, employees or persons under Lessee's control

13. **INDEMNITY.**

a. Lessee agrees to defend, indemnify, and hold Lessor harmless from any and all claims, demands, suits, actions, judgments, and recoveries for or on account of damage of the property, or injury or death to the person of Lessee, Lessee's employees, servants, agents, licensees, invitees, or other persons, firms, or corporation caused by or due to the condition of the Premises, including the motor fuel islands and adjacent areas, or the operation of all business activities conducted on the Premises, if such losses, damages, or injuries are allegedly to have been proximately caused by the negligence of Lessee or Lessee's agents or employees. This obligation shall be in addition to the insurance obligations of the Lessee set forth above.

b. With respect to acts, omissions or occurrences during the Primary Term (or any Extended Term) of this Lease, Lessee will be solely responsible for and shall defend, indemnify and hold harmless Lessor (its affiliates and its and their respective officers, directors, employees, shareholders, agents, and representatives) from and against all claims, liabilities, obligations, losses, damages, assessments, penalties, judgments, costs, response costs, removal costs, costs of investigation, monitoring costs, remediation costs, or expenses (including without limitation legal expenses, Litigation Expenses, consulting and expert fees and expenses and any other fees and costs incurred in investigating, preparing, defending or prosecuting any litigation, claim, action, notice, suit, proceeding or demand) of whatever kind or nature, known or unknown, contingent or otherwise, arising out of or in any way connected with or attributable to: (1) the presence, disposal, release, or threatened release from or on the Premises of any Hazardous Material, the presence of which has been permitted by Lessee; (2) any personal injury (including death) or property damage (real or personal) arising out of or related to any Hazardous Material from or on the Premises the presence of which has been permitted by Lessee; (3) any lawsuit brought or threatened, settlement reached, or government order, investigation or action relating to any Hazardous Materials from or on the Premises the presence of which has been permitted by Lessee; (4) any violation of any laws applicable to Hazardous Materials from or on the Premises the presence of which has been permitted by Lessee; (5) any environmental damage caused by Hazardous Material from or on the Premises the presence of which has been permitted by Lessee; and (6) Lessee's breach of its obligations in this Lease with regard to compliance with environmental laws and regulations. If any action or proceeding is brought against Lessor by reason of any such claim or loss for which Lessee has agreed to indemnify Lessor, Lessor will immediately give notice to Lessee, and Lessee will defend the same at Lessee's expense, with counsel of Lessee's choice and reasonably acceptable to Lessor. Lessee's obligation under this Section shall be in addition to any other obligations and liabilities of Lessee under this Lease, and shall survive the expiration or the termination of this Lease.

14. **SECURITY DEPOSIT.** Lessor hereby acknowledges receipt from Lessee of the sum of one month Rent which shall be held as security by Lessee for the faithful performance by Lessee of all its obligations hereunder. In the event Lessee fails in any way to perform hereunder, Lessor shall have the right to apply such security to such default, consent to which application Lessee confirms by its execution of this Lease. Funds held by Lessor as security may be co-mingled with Lessor's other funds and shall not be interest bearing.

15. **LESSOR'S LIEN PRIVILEGE & SECURITY INTEREST.** Lessor shall have a statutory lien or privilege and, in addition, Lessee hereby gives to Lessor an express lien and security interest upon all of Lessee's property, inventory and accounts receivable now or at any time hereafter placed in or upon the Premises ("Security"), to secure the prompt payment of the Rent and all other charges and obligations stipulated provided herein, all exemptions of such property, or any of it, being waived. Additionally, at Lessor's request at any time during this Lease, Lessee shall execute and

Consigned Lease/PMPA not applicable

4

deliver to Lessor a security agreement, financing statement, or other document as Lessor may specify to establish or perfect Lessor's security interest in the Security.

16. **LIQUIDATED DAMAGES.** Lessee specifically agrees that in the event that Lessee should breach any of the terms of the following subsections of this Lease:

> Sections 7(e), 7(e), 7(g), 7(h), 7(i) and/or 7(j).

Lessor would suffer harm which would be difficult if not impossible to quantify. It is therefore specifically agreed by Lessee that Lessor is entitled to have and recover any and all actual damages related thereto but in no case less than the liquidated damage of $25.00 per day per violation by Lessee. Lessee acknowledges that the foregoing amount is a conservative, reasonable estimate of the damages that would be suffered as a result of the breach of Lessee's covenants made in the subsections enumerated herein.

17. **OPTIONS.** To the extent that any of the following are checked-off and initialed by both parties, the following options and rights shall exist.

☒ **Option to Purchase Inventory, Furniture, Fixtures upon Termination.** Upon the termination of this Lease, for any cause whatsoever, be it the expiration of the Primary Term or an Extended Term, Lessor shall have the option of purchasing all or any portion of Lessee's furniture, fixtures, equipment, and inventory situated upon the Premises, which option may be exercised by Lessor by giving written notice to Lessee no later than sixty (60) days following the Effective Date of Termination of the Lease. In the event Lessor and Lessee shall be unable to agree upon the fair market value of Lessee's furniture, fixtures, inventory and equipment, then each shall select an appraiser of his choosing, and the two appraisers thus selected, unless they agree among themselves to a value, shall select a third appraiser, and a majority of the three appraisers shall determine the fair market value. Each party shall bear the costs and expenses of the appraiser selected by him, and the parties shall each bear one-half (1/2) of the costs and expenses of the third appraiser. The purchase price shall be paid by Lessor to Lessee within thirty (30) days of the determination of said price, as provided herein, provided however, that Lessor retains the right to deduct and/or offset from said purchase price any Rent or monies owed by Lessee hereunder. The parties specially recognize that any going concern value or goodwill attached to the business conducted on the Premises is attributable to Lessor's brand name and trade name and, therefore, no consideration will be due and owing by Lessor to Lessee in the event this option to purchase is exercised for any such going concern value or goodwill. Both parties also agree there shall be no other payments due from Lessor to Lessee at termination.

Lessor's Initials

Lessee's Initials

☒ **Option to Purchase Premises.** In consideration of $1.00 cash in hand paid to Lessor, the receipt and sufficiency of which is hereby acknowledged by Lessor, Lessor hereby agrees that it shall not sell, transfer or otherwise convey all or any portion of its interest in the Premises without first offering to sell the Premises to Lessee on the same terms and conditions. Lessor shall notify Lessee of all the terms and provisions, and shall offer to sell the Premises on the same terms. Lessee shall have a period of twenty (20) days from the date of its receipt of the written notice from Lessor to accept such offer on the same terms, provisions and conditions stated in such written notice, which acceptance must be in writing and be received by Landlord prior to the expiration of such period. The closing of a purchase by Lessor of the Premises shall be held at the time and place specified in the written notice from Lessor, or such earlier date as is specified by Lessee, but in no event later than sixty (60) days after the receipt by Lessee of the written notice from Lessor. In the event Lessee rejects or fails to properly accept the offer made by Lessor, Lessor shall be free to sell, transfer, assign or convey the Premises to such third party on substantially the same terms, provisions and conditions set forth in its notice to Lessor. Notwithstanding the foregoing, no Lessee option to purchase premises shall exist in circumstances involving Lessor chain sales, which shall mean the sale by Lessor or three (3) or more pieces of immovable property used in connection with Lessor's Motor Fuel Operations.

Lessor's Initials

Lessee's Initials

18. **VIDEO GAMING & GAMBLING.** All rights to apply for and to receive a video gaming license and/or other state permit or license necessary to conduct gambling on the Premises, as well as all rights with respect to video gaming and gambling revenue are expressly reserved to Lessor. Lessee hereby agrees not to act in any manner inconsistent with said rights and shall take all action necessary to cooperate and further said rights, as requested from time-to-time by Lessor.

19. **PRO-RATED REFUND OF GOODWILL PAYMENTS.** In the event that goodwill monies were paid by the Lessee to Lessor in return for benefits to Lessee's Business Operations ("Goodwill Payments"), then Lessor shall be required to refund said monies in the following circumstances. If Lessor elects to sell the Premises during the Primary Term or any Extended Term and Lessee elects not to exercise its right to purchase the Premises (if such option is checked off and initialed in Section 17 above), then Lessor agrees to refund to Lessee, on an amortized basis, any Goodwill Payments paid by Lessee. The amortized amount refunded to the Lessee shall be calculated by taking the total amount paid by Lessee, dividing it by the number of years in the Primary Term of the Lease, then multiplying that figure by the number of years left in the Primary Term of the Lease (exclude any fractional years). For example, if the Lessee paid $50,000 in Goodwill Payments to Lessor, the Primary Term of the Lease is 5 years, and the date the Premises are sold is 2 ½ years into the Primary Term, then the Lessor must refund $20,000 to the Lessee (i.e., $50,000 ÷ 5 years x 2 years). No Goodwill Payments shall be otherwise due by Lessor to Lessee in the event that termination of the Lease is due to any Default by Lessee under the Lease.

20. **DEFAULTS.** Each of the following shall constitute an event of default ("Default"):

    a. The Lessor or Lessee fail to keep, perform, observe and/or comply with any promise, covenant, term, condition and obligation under this Lease or any Ancillary Agreement;

    b. The Lessee becomes insolvent, or shall take the benefit of any present or future insolvency statute, makes a general assignment for the benefit of creditors, consents to the appointment of a receiver, trustee, or liquidator of all or substantially all of its property, or files a petition in bankruptcy or is adjudged bankrupt.

    c. The Lessee fails to timely pay any Rent or monies hereunder, when due;

    d. The termination by either party or both parties of any Ancillary Agreement, in which case this Lease shall also terminate upon the same terms and the same time;

    e.   The Lessee assigns or subleases this Lease without the prior express written permission of Lessor;

    f.   Upon the death or interdiction of Lessee;

    g.   Upon the loss of any liquor or tobacco license held by the Lessee, or the inability of Lessee to sell alcoholic or tobacco products, with respect to Lessee's Store Operations.

21. **TERMINATION.** Upon an event constituting a Default, and such Default continues uncured for a period of five (5) days after written notice of such Default, then:

    a.   If the Lessee is the party in Default, then the Lessor may, at its option to choose all or just one of the following:

        i.   Recover any delinquent Rent, monies or payments due under this Lease or Ancillary Agreement, together with all interest due thereon, which shall include but not be limited to offsetting Rent and/or monies due without notice thereof and offsetting by ACH or otherwise monies, commissions or amounts payable by Lessor to Lessee under this Lease or Ancillary Agreement;

        ii.   Correct or resolve an event of Default, including but limited to entering the Premises and making repairs or corrections necessary to maintain the Premises, in which event Lessor retains the option of debiting the security furnished by Lessee hereunder or collecting the costs to cure from the Lessee;

        iii.   Terminate this Lease, in which event Lessee shall immediately surrender the Premises to Lessor and Lessor shall be entitled to enter upon, take possession of the Premises, and expel or otherwise remove Lessee therefrom, all without further notice or demand. This right shall also include the right of Lessor to have and recover all of damages and losses to Lessor arising out of the Default from the Lessee. If after termination of the Lease, Lessee holds over without the express written consent of Lessor, such holding over shall be deemed a tenancy at sufferance, and Lessor shall be entitled to receive three (3) times the normal Rents as liquidated damages. Furthermore, Lessee shall be liable and shall pay to Lessor any costs to remove and/or store Lessee or other occupant's property.

        iv.   Seek any other appropriate legal or equitable remedy, including but not limited to injunctive relief, specific performance or damages.

22. **CONDITIONS OF PREMISES UPON TERMINATION.** Lessee shall leave the Premises in the same condition as it was at the commencement of the Lease or in the same condition to which it was brought by the efforts of the Lessor after commencement of this Lease, except for normal wear and tear damage or destruction not caused by Lessee's negligent or willful acts or omissions.

23. **NOTICES.** Any notice required hereunder ("Notice") shall be in writing and shall be deemed served to the other party either when personally delivered to the other party, or when mailed via certified mail to the other party at the address first set forth herein above, unless a more recent address has been received.

24. **COMPLIANCE WITH LAWS & REGULATIONS.**

    a.   **General Laws & Regulations:** Lessee shall comply fully and require Lessee's Motor Fuel Operations to comply fully with all applicable laws, regulations, judicial and administrative orders, and guidelines of any governmental authority, including without limitation (a) those regulations regarding the availability of Material Safety Data Sheets, as located in Title 29, Code of Federal Regulations, Sections 1903.2, 1910.103, 1910.106, 1910.120 and 1910.1200; (b) all requirements of the American with Disabilities Act, 42 U.S.C. 12101 et seq, and the regulations promulgated thereunder; (c) the requirements of the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq, and the regulations promulgated thereunder; and (d) the Clean Air Act, 42 U.S.C. Section 7401 et seq, and the regulations promulgated thereunder.

    b.   **Environmental Laws & Regulations:**

        i.   Lessee must notify Lessor of any notices by or actual actions by the DEQ, EPA or any State or Federal agency ("Agencies") with regard to inspections, required reports, and other activity. Lessee must furnish to Lessor copies of all inspections, reports and other written correspondence with or notification by Agencies. To the extent that the Lessee fails to comply with this Section 23, Lessee shall be responsible for any fines, costs and penalties for its failure to respond or timely act

        ii.   Lessee expressly acknowledges that it is the sole operator of the Motor Fuel Operations conducted on the Premises, and has full responsibility for the operation of the underground motor fuel storage tanks, piping system and motor fuel pumping equipment.

        iii.   Lessee shall not cause or permit any Hazardous Material, as hereinafter defined, to be brought upon, kept, or used in or about the Leased Premises, except for such Hazardous Material as is necessary or useful to Motor Fuel Operations and, even then, in a manner that is consistent with federal, state and local law ("Legal Requirements"). Lessee expressly affirms, warrants and agrees that it shall take no action that is inconsistent with the Environmental Protection Act, and, more specifically, with the regulations governing the storage, dispensing and sale, of unleaded gasoline.

        iv.   Lessee further warrants and represents that it shall comply with all Legal Requirements and that any Hazardous Material brought upon, kept or used by Lessee on the Premises, and all containers therefore or residues thereof, shall be used, kept, stored, transported and disposed of in a manner that complies with all Legal Requirements.

        v.   Lessee shall not discharge, release, leak, or emit, or permit to be discharged, released, leaked, or emitted, any Hazardous Material into any buildings, parking areas, common areas, atmosphere, ground, groundwater, sewer or drainage system of the Premises, or any body of water, if that material (as is reasonably determined by Lessor, or any governmental authority) pollutes or contaminates the same, adversely affects (1) the health, welfare, or safety of persons, whether located on the Premises or elsewhere, or (2) the condition, use, or enjoyment of the Leased Premises, or any other real or personal property, or if the discharge, release, leak or emission would violate or be prohibited by any Legal Requirement.

        vi.   Lessee shall disclose to Lessor, to the extent and in the same manner that Lessee is required to make such disclosures by applicable Legal Requirements and as Lessor shall reasonably request in writing from time to time, the names and approximate amounts of all Hazardous Materials that Lessee intends to store, use, or otherwise allow to remain on the Leased Premises together with the operating procedures and method of handling, storing, transporting, using and disposing of such Hazardous Materials listed.

6

vii. Should Lessee fail to perform or observe any of its obligations or agreements pertaining to Hazardous Materials under this Lease or under applicable Legal Requirements pertaining to the Premises and such failure continues after notice by Lessor to Lessee, then Lessor shall have the right, but not the duty, without limitation upon any of the rights of Lessor under this Lease, to enter the Premises and perform the same at Lessee's cost. In no event shall this clause relieve Lessee of any liability with regard to liability for all costs, fines and expenses related to Lessee's action or inaction under this Agreement.

viii. Lessee hereby agrees that it shall be fully liable for all costs and expenses related to the presence, use, storage, or disposal of Hazardous Material permitted by Lessee to be located in or about the Premises, and Lessee will be solely responsible and shall give immediate notice to Lessor of any violation or potential violation of the provisions of this Section. The provisions of this Section shall be in addition to any other obligations and liabilities Lessee may have to Lessor, at law or equity, and shall survive the expiration or other termination of this Lease.

ix. "Hazardous Material" includes any substance:

A. The use, storage, handling, disposal or presence of which requires a permit, authorization, approval, investigation or remediation under any federal, state or local statute, regulation, ordinance, order, action, policy or common law; or

B. Which is or becomes defined as any (i) "hazardous substance," "pollutants," or "contaminant" (as defined in Sections 101(14) and (33) of CERCLA or the regulations issued pursuant to Section 102 of CERCLA and found at 40 C.F.R. §302), including any element, compound, mixture, solution, or substance that is or may be designated pursuant to Section 102 or CERCLA; (ii) substance that is or may be designated pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251, 1321(b)(2)(A)) ("FWPCA"); (iii) hazardous waste having the characteristics identified under or listed pursuant to Section 3001 of the Resource Conservation and Recovery Act, as amended (42 U.S.C. §§ 6901, 6921) ("RCRA") or having characteristics that may subsequently be considered under RCRA to constitute a hazardous waste; (iv) substance containing petroleum, as that term is defined in Section 9001(8) of RCRA; (v) toxic pollutant that is or may be listed under Section 307(a) of FWPCA; (vi) hazardous air pollutant that is or may be listed under Section 112 of Clean Air Act, as amended (42 U.S.C. §§ 7401, 7412); (vii) imminently hazardous chemical substance or mixture with respect to which action has been or may be taken pursuant to Section 7 of the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601, 2606); (viii) source, special nuclear, or by-product material as defined by the Atomic Energy Act of 1954, as amended (42 U.S.C. § 2011 et seq.); (ix) asbestos, asbestos-containing material, or urea formaldehyde or material that contains it; (x) waste oil and other petroleum products; and (xii) any other toxic materials, contaminants, or hazardous substances or wastes pursuant to any Legal Requirement.

C. Which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise dangerous to human health or the environment and is or becomes regulated by any governmental authority, agency, department, commission, board, agency or instrumentality of the United States, the State of Louisiana or any political subdivision thereof.

x. "Legal Requirements" means all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations (proposed or promulgated), permits, licenses, certificates, authorizations, restrictions and requirements of all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, foreseen or unforeseen, ordinary or extraordinary, which now or at any time hereafter are applicable to the Premises or Motor Fuel Operations, or any use or condition of the Premises or Motor Fuel Operations, including without limitation, all applicable building codes and zoning requirements.

xi. "Litigation Expenses" means and includes, among other things, all of the following arising as a result of default: (a) legal expenses; (b)accounting expenses; (c) expert expenses; and (d) all court costs and expenses.

**g. CONFLICT OF INTEREST.** During the Primary Term and any Extended Term of this Lease, Lessee agrees to immediately notify Lessor to the extent that it obtains, directly or indirectly, an ownership or financial interest in any business operation or business entity that engages in the retail sale of motor fuel in the state within which the Premises are located or that otherwise competes with Lessor with respect to Lessor's Motor Fuel Operations.

**h. MISCELLANEOUS.**

a. **Quiet Enjoyment.** Provided Lessee complies with all terms, conditions, and obligations hereunder, Lessee shall quietly have, hold and enjoy Use of the Premises.

b. **Cumulative Rights.** The remedies of both parties hereunder shall be deemed cumulative and no remedy of either party, whether exercised or not, shall be deemed to be in exclusion of any other.

c. **No Waiver.** Lessee agrees that in the performance of this Lease and the terms, covenant, and conditions hereunder, time shall be of the essence and that Lessor's acceptance of partial or delinquent payments or performance hereunder, or failure by Lessor to exercise any right or remedy shall not constitute a waiver of any obligation or performance of Lessee or right of Lessor or a waiver of any other similar or subsequent default or failure.

d. **Assignment & Subletting.** Lessor reserves the right to assign this Lease without the consent of the Lessee. Lessee may not assign this Lease and may not in any way sublease the Premises without the prior express written consent of the Lessor. This Lease shall be binding upon the heirs, successors and assigns of the parties.

e. **Attorneys' Fees and Expenses.** In the event Lessor shall be required to discharge any obligation of Lessee required hereunder, pay any taxes, liens, interest, or pay for any repairs, maintenance, upkeep or other debt or obligation of Lessee required hereunder, or shall be required to expend sums for the enforcement of this Lease or protection of Lessee's rights created by this Lease, or take such further action deemed by the Lessor necessary to protect the Premises and Lessor's interest therein, Lessor shall be entitled to reimbursement for all sums so expended including, but not limited to, attorney's fees (including costs of legal assistants) and court costs. All sums so expended shall bear interest from the date of payment at a rate of one half percent ($1\frac{1}{2}$%) per month.

f. **No Agency Relationship.** Nothing contained in this Lease is intended or shall be construed as reserving or granting to Lessor any right to exercise control over or to direct the conduct or management of Lessee's business conducted on the Premises. To the contrary, the entire control and direction of Lessee's business operations shall be vested in the Lessee. Lessee shall have no authority to contract for Lessor or make any commitment whatsoever in the name of or on behalf of Lessor. The relationship between Lessor and any of

7

Lessee's employees, agents, customers, visitors, invitees, guests, contractors, subcontractors, licensees, or any other person(s) whomsoever, in connection with this Lease is that of independent contracting parties, and is not, and shall not be deemed to be, any other relationship, including without limitation that of joint venturers, partners, or principal-agents.

g. **Severability.** If, for any reason, any provision in this Lease shall not be authorized by law or shall be deemed void for public policy reasons or otherwise, then that provision shall be severable from the remaining provision which shall continue in full force and effect.

h. **Entire Agreement.** This Lease represents the entire agreement between the parties and cancels and supersedes any previous agreements for the lease of the Premises between the parties. Any and all amendments and modifications to same shall be in writing and executed by both parties.

i. **Counterparts.** This Lease may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

j. **Governing Law.** This Lease shall be deemed to be negotiated, executed and performed under the laws of the State first mentioned hereinabove and all disputes related to this Lease, whether past, present or future, shall be governed by and construed under said laws.

k. **Interpretation.** Should any provision of this Lease require judicial interpretation, Lessor and Lessee hereby agree and stipulate that the court interpreting or considering same shall not apply the presumption that the terms hereof shall be more strictly construed against a party by reason of any rule or conclusion that a document should be construed more strictly against the party who itself or through its agent prepared the same, it being agreed that all parties hereto have participated in the preparation of this Lease and that each party had full opportunity to consult legal counsel of its choice before the execution of this Lease.

l. **Headings.** The section headings contained in this Lease are for convenience only and shall not enlarge or limit the scope or meaning of the various and several sections hereof. Words in the singular number shall be held to include the plural, unless the context otherwise requires.

m. **Authority to Contract.** Each party hereto warrants, represents and covenants that it has full, unfettered legal right, power and authority to execute and deliver this Lease.

n. **Eminent Domain.** If the whole or any part necessary for Motor Fuel Operations upon the Premises shall be acquired or condemned by eminent domain for any public or quasi-public purpose, then the Lease shall cease and terminate as of the date of title vesting in such proceeding and all Rent shall be paid up to that date and Lessee shall have no claim against Lessor for the value of any unexpired term of this Lease. In the event of any condemnation or taking as herein provided, whether whole or partial, the Lessee shall not be entitled to any part of the award, as damages or otherwise.

o. **Force Majeur.** Lessor shall not be liable to Lessee for compensation, loss or damage due to any delay or failure by Lessor to furnish motor fuel with respect to Motor Fuel Operations due to (i) compliance with any order, request or control of any governmental authority or person purporting to act therefore; (ii) when the supply or products or any facility or production, manufacture, storage, transportation, distribution or deliver contemplated by Lessor is interrupted unavailable or inadequate because of wars, hostility, public disorders, acts or enemies; (iii) sabotage, strike, walkouts, labor or employment difficulties, fires, floods, acts of God, accidents or breakdowns, plant shutdowns for repairs, maintenance or inspection, weather conditions, or temporary cessation of Lessor's Motor Fuel Operations due to remodeling or renovation or any case beyond its control, whether or not similar to any of the foregoing.

p. **Discharge of Liens.** With respect to all construction approved in advance by Lessor, Lessee shall promptly pay all its contractors and materialmen, so as to minimize the possibility of a lien attaching to the Premises, and should any such lien be made or filed, Lessee shall bond against or discharge the same within ten (10) days after written request by Lessor.

q. **Estoppel Certificate.** Lessee agrees that within ten (10) days of being requested to do so by Lessor, any mortgagee or proposed mortgagee, it will execute and deliver to such party requesting same an estoppel certificate identifying this Lease and acknowledging the status of this Lease and the performance of Lessor's obligations under this Lease as of the date of such estoppel certificate.

r. **Limitation of Damages.** Unless expressly provided for herein, neither party hereto shall be liable for any indirect, special, incidental, consequential or punitive damages whether under tort, contract strict liability, statute or otherwise.

**ALL PARTIES ACKNOWLEDGE THAT THIS AGREEMENT IS SUBJECT TO APPROVAL OF THE U.S. BANKRUPTCY COURT AS PART OF HILL CITY OIL COMPANY, INC.'S CHAPTER 11 BANKRUPTCY. THE AGREEMENT WILL BECOME EFFECTIVE WHEN AUTHORIZED BY THE BANKRUPTCY COURT.**

    **THUS DONE AND SIGNED** in the presence of the undersigned competent witnesses after due reading of the whole Lease, the parties hereto have caused this Lease to be executed pursuant to the appropriate authority duly given on the date first mentioned above.

LESSOR:

By:

Title: Herb Stathes, President
      Hill City Oil Company, Inc.

WITNESSES:

Print Name: _____

Print Name: _____

LESSEE:

By: _____

Title: _____

WITNESSES:

Print Name: _____ JAY KING _____

Print Name _____

Consigned Lease/PMPA not applicable

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

## MOTOR FUEL SALES MANAGEMENT AGREEMENT

THIS MOTOR FUEL SALES MANAGEMENT AGREEMENT, ("Agreement") is made and entered into on the _13th_ day of _July_____, 20_06_ ("Effective Date") by and between **Hill City Oil Company, Inc.**, a Mississippi corporation, whose address is 1409 Dunn Street, Houma, LA 70360 ("Marketer"); and **Tolliver Enterntainal Holding Corp.**, represented by William McFarland, Michael Tolliver and Vincent Tolliver,, whose address is _P.O. Box 67 Monroe, La 71211_ ("Dealer"), who for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby agree as follows:

### WITNESSETH

WHEREAS, Dealer operates a convenience store business, including retail consumer sales, rentals and services ("Dealer's Store Operations") located at **1001 Broadway, Delhi, Louisiana** , (the "Premises"), at which location Dealer will sell Distributor's motor fuels on a non-consignment basis ("Dealer's Motor Fuel Operations"). Collectively Dealer's Store Operations and Dealer's Motor Fuel Operations shall be referred to as "Dealer's Business Operations"; and

WHEREAS, Distributor currently engages in, among other things, the supply of branded and unbranded motor fuel for retail sale to consumers ("Distributor's Motor Fuel Operations"); and

WHEREAS, Dealer derives substantial revenue and profits from its Dealer's Store Operations, with such operations being separate, apart and distinct from Dealer's Motor Fuel Operations and Distributor's Motor Fuel Operations; and

WHEREAS, Dealer wishes to purchase from Distributor and Distributor wishes to exclusively sell to Dealer motor fuel, which will be resold by Dealer to for retail consumer use; and

WHEREAS, Dealer desires to assume all risk and uncertainty with regard to Dealer's Business Operations; and

WHEREAS, the parties desire for Dealer to retain ultimate operation and control of the retail sales of motor fuels upon the Premises (both with respect to Dealer's Motor Fuel Operations and Distributor's Motor Fuel Operations, which hereinafter shall be collectively referred to as "Motor Fuel Operations") with Dealer retaining the risks of such operation and with Dealer supervising Motor Fuel Operations and performing other day-to-day operational services merely incidental thereto, under the terms and conditions specified herein; and

WHEREAS, in recognition of the mutual benefits to be obtained from maintaining Distributor's and Dealer's separate business operations and the retention of Dealer to provide supervisor and operational services, the parties have executed this Agreement and a separate Agreement, with the economic relationships of the parties to one another and to third persons strictly and solely governed by these terms and said agreements; and

WHEREAS, the parties acknowledge that this Agreement assures that each party will receive the total revenue attributable to such party's service, capital investment, and business risks and that no portion of the revenue attributable to the service, capital investment and business risks of the other party;

WHEREAS, Distributor and Dealer acknowledge that in connection with this Agreement they may have also executed, among other things, a Lease Agreement and/or Jubilee Proprietary Mark Agreement (hereinafter collectively "Ancillary Contracts"); and

NOW THEREFORE, for and in consideration of the mutual covenants herein, the parties agree to the following:

1. **TERM.** The Term of this Agreement shall be for ten (10) years, beginning on the _15th_ day of _July_____, 20 _06_ ("Effective Date') and ending on the _14th_ day of _July_____, 20_11_.

2. **SALE OF MOTOR FUEL & PROMOTION OF MARKETER.**

   a. Dealer agrees to offer for retail sale motor fuel exclusively supplied by Marketer. Dealer further agrees that part of Dealer's Motor Fuel Operations is to operate Marketer's motor fuel dispensing equipment at the Store and to provide supervisory and other incidental services necessary for the efficient operation of said equipment, and the ultimate retail sale of Marketer's motor fuel. Dealer recognizes that it will financially benefit from increased retail sales of Marketer's motor fuels. Dealer further recognizes that the Dealer Store Operations will benefit from consumer traffic due to increased retail sales of Marketer's motor fuels. In return for these benefits, Dealer agrees to use its best efforts to diligently promote the sale of Marketer's motor fuels upon the Premises.

   b. The motor fuel sold to Dealer shall be the _CHEVRON_____ brand of motor fuel or the brand of Marketer's substitute supplier ("Brand" or "Branded"), which election is and shall be subject to the sole discretion of Marketer. However, if for any reason Marketer ceases to be an authorized distributor of the said Brand in the geographical locality of the Premises or decides to voluntarily cease marketing the Brand at the Premises or through the actions or negligence of Dealer the Motor Fuel Operations on the Premises are debranded, then, at Marketer's election, (a) Marketer may terminate this Agreement without liability to Dealer as of a date coextensive with the termination of its distributorship rights for the Brand in said geographical locality or (b) require the Dealer to rebrand its station to a brand which is then being sold by Marketer.

   c. If at any time the volume of motor fuel Marketer has available for sale and delivery to its customers, because of shortage of supply from Marketer's primary supplier or its other regular sources of supply or in the industry generally, or for any other reason, is less than the volume needed to supply all of its customers' demands, it is understood and agreed that Marketer shall make a reasonable effort to allocate and distribute the volume of available motor fuel among its customers under a plan or formula of allocation that Marketer, in its sole discretion, determines is fair and reasonable. During the time the shortage exists, the volume Dealer is required (as the case may be) to purchase from Marketer shall be reduced to the amount Marketer allocates to Dealer pursuant to such

1

allocation plan or formula. When the shortage ends, neither party shall be obligated to make up any quantities not purchased by Dealer nor not sold and delivered by Marketer.

d. This Agreement does not preclude Marketer from supplying to others and/or otherwise selling motor fuel in any market or geographic area in direct competition with Dealer.

3 **PRICE.** The purchase price to be paid by Dealer shall be the terminal price by grade (rack price) plus freight, and all applicable federal, state and local taxes and fees, and the following (which shall be collectively referred to as "Distributor Margin"):

a. Unleaded Regular:    rack price plus 3.5 cents per gallon
b. Unleaded Premium:   rack price plus 3.5 cents per gallon
c. Unleaded Plus:       rack price plus 3.5 cents per gallon
d. Diesel:             rack price plus 3.5 cents per gallon
e. Other:              rack price plus 3.5 cents per gallon

If Distributor's right to charge or receive any price payable pursuant to this Agreement, or to revise any price as provided in this Agreement is restricted or prohibited by law, regulation, or order of any governmental authority, Distributor may from time to time amend the provisions of this Agreement to the extent necessary to comply with the applicable regulation or order, but this Agreement shall otherwise continue to remain in full force and effect.

4. **PAYMENT.** Dealer shall pay the purchase price of motor fuel delivered to the Premises in lawful money of the United States without demand or discount made through the electronic transfer of monies ("EFT") to Distributor's account at the time of delivery and in no event later than five (5) days after delivery or on the day of next delivery whichever comes first. If Dealer shall fail to make any payment when due as herein provided, Distributor may suspend further deliveries, without prior notice, until such payment has been made, or until this Agreement is terminated or not renewed. Such suspension shall not operate to relieve Dealer of its other obligations under this Agreement. Upon payment of any past due amount and any additional deposits required by Distributor as a condition precedent to resuming deliveries, deliveries shall immediately recommence if this Agreement has not been suspended. The additional deposit required by Distributor shall not exceed Dealer's average purchases for any preceding thirty (30) day period. Distributor may charge Dealer's deposit account at any time and from time to reimburse it for any sums then due of Dealer. If Distributor charges Dealer's deposit account for any reason permitted herein, Dealer shall replenish said account upon demand. Dealer's deposit account amount may be co-mingled with Distributor's other funds and shall be non-interest bearing for the Dealer. Nothing herein shall limit Distributor's remedies in the event of Dealer's failure to make any such payment when due.

5. **DISTRIBUTOR'S EQUIPMENT, MAINTENANCE, REPAIR & OPERATIONS OBLIGATIONS.** In furtherance of this Agreement, Distributor shall furnish the following, at its own cost and expense, in furtherance of Motor Fuel Operations upon the Premises:

a. Motor fuel-dispensing equipment.
b. Underground motor fuel tanks and related pumping equipment.
c. Labor and material necessary for the proper installation of Distributor's equipment, unless repairs are caused by abuse and neglect by Dealer or Dealer's agents or employees.

6. **DEALER'S EQUIPMENT, MAINTENANCE, REPAIR & OPERATIONS OBLIGATIONS.** In furtherance of this Agreement, Dealer shall furnish the following, at its own cost and expense, in furtherance of Motor Fuel Operations upon the Premises:

a. The number, type, and make of credit card transaction machines deemed by the Marketer necessary for the successfully marketing of Marketer's motor fuel. This includes all related installation fees, line fees and transaction fees.
b. Dealer shall be responsible for the proper operation of Marketer's equipment and other property that is used by Marketer in the operation of Motor Fuel Operations. Dealer hereby acknowledges that such equipment is in good and operable condition. Dealer agrees to comply with applicable state laws and municipal ordinances, rules and regulations in connection with the operation of such equipment.
c. Dealer shall be responsible for the proper operation of Marketer's equipment and other property that is used in the Motor Fuel Operations. Dealer hereby acknowledges that such equipment is in good and operable condition. Marketer may deliver certain equipment from time to time as Marketer deems necessary for Motor Fuel Operations upon the Premises.
d. Dealer agrees to comply with applicable State Laws and municipal ordinances, rules and regulations in connection with the operation of all equipment provided under this Agreement. Dealer will be responsible for any fines penalties, assessments due to the negligence or omissions of Dealer or its employees.
e. Dealer shall promptly respond (in writing if requested by Marketer) to any inquiries or complaints received by Dealer or Marketer in connection with Dealer's Motor Fuel Operations or Marketer's Motor Fuel Operations and take reasonable action to correct or satisfactorily resolve each such inquiry or complaint. If in Marketer's judgment Dealer fails to adequately respond to and correct or resolve customer inquiries or complaints, Marketer shall have the right but not the obligation to resolve such matters directly with customer, at Dealer's expense.
f. Provide immediate notice to Marketer of any claims by retail consumers of Marketer's motor fuel with regard to an alleged vice, defect or variance in quality, in which case Dealer shall retain all records and documentation with regard to the allegations and which may prove or disprove such allegations.

7. **HOURS OF OPERATION.** Both parties acknowledge the mutual benefit to be derived from keeping both Marketer's and Dealer's business operations open for business, properly staffed and adequately illuminated during at least those hours when competing businesses are open for operation. Hence, Dealer agrees to keep Marketer's Motor Fuel Operations open for business and adequately staffed for a total of twenty-four (24) hours per day seven (7) days per week, unless otherwise agreed by Marketer.

8. **SCHEDULING OF PERSONNEL.** Dealer shall cause to be scheduled during the hours of operation set forth herein, qualified, trained personnel to operate Marketer's motor fuel dispensing equipment and to collect for purchases made. The

2

number of employees hired, the levels of compensation, and the hours of labor shall be determined by Dealer, with Dealer responsible for all federal and state taxes, withholds, and insurance coverage incident to such employment. Dealer shall be solely liable for any fines, sanctions or other penalties imposed as a result of Dealer's failure to comply with all state and federal regulations regarding Dealer's employees. **SAID EMPLOYEES SHALL BE EMPLOYEES OF DEALER AND NOT EMPLOYEES OF MARKETER.**

9. **TITLE AND PRICES OF MOTOR FUELS.** Title to all motor fuel shall remain in Marketer until sold to retail consumers, at which time title shall pass to such consumer retail purchaser. Dealer shall act as a bailee of Marketer's motor fuel inventory on Store premises. Marketer shall have the unqualified right to set the retail prices of Marketer's motor fuel (including but not limited to self-service grades of motor fuel) sold upon the Premises. In establishing the prices, Marketer will endeavor to keep such prices competitive with the retail prices of other major brands of motor fuel sold at retail in the trade areas.

10. **ORDERING AND DELIVERY.** Dealer shall determine the amount of Marketer's motor fuels sold the previous day and notify Marketer daily by methods determined by Marketer. Dealer shall both gauge and check for water contamination the underground motor fuel storage tanks daily and report the daily tank levels or the presence of water to Marketer by such methods as Marketer determines. There shall be a presumption that Dealer did not daily inspect the motor fuel storage tanks for water in the event that tank tightness testing concludes that said tanks comply with DEQ pressure regulations. In the event that said tanks become contaminated with water and Dealer fails to immediately notify Marketer thereof, consistent with the daily examination requirement hereunder, then Dealer shall be responsible for all consequential damages that result, including but not limited to payment for repairs to consumer vehicles due to motor vehicle fuel tainted with water.

11. **REPORTS AND INVENTORY RECORDS.** Dealer shall keep a daily record of motor fuels sales, meter readings, and physical inventory measurements for each tank with respect to all business done at Marketer's motor fuel operations, and Marketer may at any time examine such records, and make such inventories and inspections as it deems necessary. Dealer agrees to retain or to turn over to Marketer, as Marketer may reasonably require, such records of business done as in Marketer's opinion may be necessary or required for federal, state or local tax audits. In order to assist Marketer in detecting tank leakage or other causes of product shortages, and/or the presence of water or other foreign substances in the tanks, and in order to assist himself and/or Marketer in complying with any government requirements, Dealer's personnel, daily and whenever specifically requested by Marketer, shall for each tank system take physical inventory measurements of the amount of motor fuel in storage and shall record cumulative meter readings simultaneously. Dealer shall take physical inventory and meter readings simultaneously. Dealer shall report the results of the physical inventory measurements and product dispenser meter readings on a daily basis, Monday through Sunday, through Marketer's computerized telephone system or other means of reporting as selected by Marketer, in Marketer's sole discretion. Failure to comply with this requirement will result in a twenty-five dollar ($25.00) per day fine for each day not reported or may result in termination of contract. Dealer hereby grants to Marketer the right to enter the Premises at any time for the purpose of taking its own inventory measurements and/or pump meter readings. Nothing contained herein shall derogate in any manner from either Dealer's or Marketer's responsibility to comply with tank registration and reporting requirements or other governmental regulations

12. **PRICING, COLLECTION AND REMITTANCES.**
    a. Dealer shall retain exclusive, sole discretion with regard to pricing of all motor fuel sold upon the Premises.
    b. Dealer shall cause to be collected the retail price per gallon for all sales of motor fuel made with regard to Motor Fuel Operations upon the Premises. All credit card sales must be handled in accordance with the applicable credit card sales guidelines.

13. **SIGNS, BRAND NAMES, PRODUCT QUALITY.** To the extent that any branded fuel is supplied to Dealer by Distributor hereunder, it is understood and agreed by Dealer that Distributor neither owns nor controls the signs, brands, and trademarks or trade names with respect to motor fuel supplied by refiners to Distributor (the "Marks"). In such case, Dealer is hereby authorized by Distributor to use these Marks in connection with Motor Fuel Operations and to display these Marks at the Premises subject to the requirements for such use imposed by the owner of the Brand and by Distributor and the following:

    a. Dealer agrees to maintain such signs and Marks in good condition and to otherwise use the Marks in a lawful manner. Dealer shall not do anything to disparage the goodwill of the Brand or to impair the Marks associated with the Brand. Dealer's right to use such Brands or Marks automatically terminates upon the expiration or termination of this Agreement.
    b. Dealer agrees not to mix, substitute, adulterate or sell Distributor's motor fuel with any foreign materials or substances. Dealer agrees not to sell or pass off motor fuels of others as the motor fuel of Distributor, or Distributor's substitute supplier. Dealer further agrees not to permit the commingling of leaded with unleaded motor fuel or the sale of motor fuel under a Brand (as the case may be) which is in fact not a Branded motor fuel or is a grade of Branded motor fuel other than that described by the label or designation or has an octane level other than that provided on the label or description.
    c. Dealer agrees to sell all motor fuel sold hereunder only under the Brand or under the brand of Distributor's substitute supplier.
    d. Dealer agrees that the painting design and colors applied to the buildings, structures, equipment, or fixtures by Dealer shall not be changed by Dealer during the term of this Agreement. Dealer also agrees to maintain the Marks on the equipment used to store and dispense such motor fuels.
    d. Any pump, tank, container, receptacle, display apparatus, or equipment of any kind furnished by Distributor, as being so identified or having painted, marked, printed, or otherwise impressed therein or affixed thereto Distributor's name, or the brand of the supplier of Distributor's motor fuel products sold (as the case may be), or the brand name of the Distributor's motor fuel products sold (as the case may be), shall be used by Dealer only in connection with Motor Fuel Operations on the Premises.
    c. Dealer agrees to maintain the Premises under the guidelines set forth in said branded program. Included under the guidelines, as set forth by Distributor's Branded supplier, the Dealer and Dealer's employees hereby agree to wear, at Distributor's sole discretion, the uniform approved by Distributor, and to participate in

3

Distributor's branded promotions at Dealer's expense, as these promotions become available.

14. **LICENSES.** Dealer shall each bear the expense of licenses required for the operation of Dealer's Motor Fuel Operations conducted upon the Premises.

15. **TAXES.** Dealer shall collect, account for and pay all federal, state and local excise and sales taxes applicable to the retail sale of Distributor's motor fuel. Dealer agrees to bear any additional tax, interest and penalties which result from Dealer's failure to collect, account for and pay such excise and sales taxes, or which result for Dealer's failure to keep proper records with such taxes.

16. **INSURANCE.** The parties acknowledge their separate and distinct insurable interests and liability risks associated with their independent business operations conducted on the Premises. To that extent the parties agree to apportion the requirement of obtaining adequate insurance coverage commensurate with their respective interest and assumed risks. To the extent that the parities have executed a separate Agreement with respect to the Premises and the sale of Distributor's motor fuel thereon, then the terms and conditions of said Agreement shall control with respect to the parties' respective insurance obligations. In the event that there is no Agreement, then the following shall apply:

   a. **Insurance Maintained by Dealer.** Dealer shall maintain in full force and effect on and after the Effective Date the following insurance:

      i. Insurance on personal property, equipment and inventory located on the Premises owned or operated by Dealer or Distributor or which pertains to Dealer's Business Operations and for the motor fuel purchased by Dealer and stored or otherwise dispensed on the Premises.

      ii. Insurance on the Premises for its full insurable value against loss or damage by all perils covered by an "all risks" insurance policy of the type generally available, provided that if such an all risks insurance policy is not generally available, then Dealer shall maintain insurance on the Premises against loss or damage by fire and against loss or damage by any other risk now and from time to time insured against by "extended coverage" provisions of policies generally available.

      iii. Comprehensive general liability insurance, with limits of not less than $1,000,000 with respect to bodily injury or death to any number of persons in any one accident or occurrence and $1,000,000 with respect to property damage in any one accident or occurrence.

      iv. Environmental pollution casualty and liability coverage with limits of not less than $1 million per event or occurrence and $1 million with respect to property damage in any one accident or occurrence.

      v. Business interruption insurance with coverage for at least six (6) months of Rent.

      vi. Worker's compensation insurance covering all persons employed by Dealer for such work and with respect to whom death or bodily injury claims could be asserted against Dealer, Distributor or the Premises.

      vii. To the extent the Premises are located in a special flood hazard Zone A or if the Premises must be insured against flood under loan requirements of the Lessor's lender, such insurance must be not less than 100% of the full replacement cost of the Premises or the maximum amount available, whichever is greater.

   Each of the insurance policies referred to in this Section shall provide (if such provision is obtainable) that it shall not be canceled or its coverage reduced without at least thirty (30) days prior written notice to Distributor and Dealer. In addition, each liability insurance policy referred to in this Section shall name Distributor as an additional assured, and each property insurance policy referred to in this Section shall contain (if such provisions are obtainable) waiver of subrogation provisions pursuant to which the insurer waives all express and implied rights of subrogation against Distributor. All insurance required of Dealer pursuant to this Section shall be original paid-up insurance policies and shall be issued by companies authorized to conduct business in the state of Louisiana and having a Best Insurance Guide rating of A- or higher. For all insurance policies referred to in this Section, Dealer shall name Distributor as a named additional assured and provide Distributor with a certificate evidencing coverage.

17. **DISTRIBUTOR'S SECURITY INTEREST.** Dealer hereby gives to Distributor an express lien and security interest upon all of Dealer's property, including but not limited to inventory and purchased motor fuel, now or at any time hereafter placed in or upon the Pemises, to secure the prompt payment of the any monies due hereunder and all other charges and obligations provided herein, all exemptions of such property, or any of it, being waived.

18. **COMPLIANCE WITH LAWS & REGULATIONS.**

   a. **General Laws & Regulations:** Dealer shall comply fully and require Dealer's Motor Fuel Operations to comply fully with all applicable laws, regulations, judicial and administrative orders, and guidelines of any governmental authority, including without limitation (a) those regulations regarding the availability of Material Safety Data Sheets, as located in Title 29, Code of Federal Regulations, Sections 1903.2, 1910.103, 1910.106, 1910.120 and 1910.1200; (b) all requirements of the American with Disabilities Act, 42 U.S.C. 12101 et seq, and the regulations promulgated thereunder; (c) the requirements of the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq, and the regulations promulgated thereunder; and (d) the Clean Air Act, 42 U.S.C. Section 7401 et seq, and the regulations promulgated thereunder.

   b. **Environmental Laws & Regulations:**

      i. Lessee must notify Lessor of any notices by or actual actions by the DEQ, EPA or any State or Federal agency ("Agencies") with regard to inspections, required reports, and other activity. Lessee must furnish to Lessor copies of all inspections, reports and other written correspondence with or notification by Agencies. To the extent that the Lessee fails to comply with this Section, Lessee shall be responsible for any fines, costs and penalties for its failure to respond or timely act

      ii. Lessee expressly acknowledges that it is the sole operator of the Motor Fuel Operations conducted on the Premises, and has full responsibility for the operation of the underground motor fuel storage tanks, piping system and motor fuel pumping equipment.

      iii. Lessee shall not cause or permit any Hazardous Material, as hereinafter defined, to be brought upon, kept, or used in or about the Leased Premises, except for such Hazardous Material as is necessary or useful to Motor Fuel Operations and, even then, in a manner that is consistent with federal, state and local law ("Legal

4

Requirements"). Lessee expressly affirms, warrants and agrees that it shall take no action that is inconsistent with the Environmental Protection Act, and, more specifically, with the regulations governing the storage, dispensing and sale, of unleaded gasoline.

iv.    Lessee further warrants and represents that it shall comply with all Legal Requirements and that any Hazardous Material brought upon, kept or used by Lessee on the Premises, and all containers therefor or residues thereof, shall be used, kept, stored, transported and disposed of in a manner that complies with all Legal Requirements.

v.    Lessee shall not discharge, release, leak, or emit, or permit to be discharged, released, leaked, or emitted, any Hazardous Material into any buildings, parking areas, common areas, atmosphere, ground, groundwater, sewer or drainage system of the Premises, or any body of water, if that material (as is reasonably determined by Lessor, or any governmental authority) pollutes or contaminates the same, adversely affects (1) the health, welfare, or safety of persons, whether located on the Premises or elsewhere, or (2) the condition, use, or enjoyment of the Leased Premises, or any other real or personal property, or if the discharge, release, leak or emission would violate or be prohibited by any Legal Requirement.

vi.    Lessee shall disclose to Lessor, to the extent and in the same manner that Lessee is required to make such disclosures by applicable Legal Requirements and as Lessor shall reasonably request in writing from time to time, the names and approximate amounts of all Hazardous Materials that Lessee intends to store, use, or otherwise allow to remain on the Leased Premises together with the operating procedures and method of handling, storing, transporting, using and disposing of such Hazardous Materials listed.

vii.    Should Lessee fail to perform or observe any of its obligations or agreements pertaining to Hazardous Materials under this Lease or under applicable Legal Requirements pertaining to the Premises and such failure continues after notice by Lessor to Lessee, then Lessor shall have the right, but not the duty, without limitation upon any of the rights of Lessor under this Lease, to enter the Premises and perform the same at Lessee's cost. In no event shall this clause relieve Lessee of any liability with regard to liability for all costs, fines and expenses related to Lessee's action or inaction under this Agreement.

viii.    Lessee hereby agrees that it shall be fully liable for all costs and expenses related to the presence, use, storage, or disposal of Hazardous Material permitted by Lessee to be located in or about the Premises, and Lessee will be solely responsible and shall give immediate notice to Lessor of any violation or potential violation of the provisions of this Section. The provisions of this Section shall be in addition to any other obligations and liabilities Lessee may have to Lessor, at law or equity, and shall survive the expiration or other termination of this Lease.

ix.    "Hazardous Material" includes any substance:

    A.    The use, storage, handling, disposal or presence of which requires a permit, authorization, approval, investigation or remediation under any federal, state or local statute, regulation, ordinance, order, action, policy or common law; or

    B.    Which is or becomes defined as any (i) "hazardous substance," "pollutants," or "contaminant" (as defined in Sections 101(14) and (33) of CERCLA or the regulations issued pursuant to Section 102 of CERCLA and found at 40 C.F.R. §302), including any element, compound, mixture, solution, or substance that is or may be designated pursuant to Section 102 or CERCLA; (ii) substance that is or may be designated pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251, 1321(b)(2)(A)) ("FWPCA"); (iii) hazardous waste having the characteristics identified under or listed pursuant to Section 3001 of the Resource Conservation and Recovery Act, as amended (42 U.S.C. §§ 6901, 6921) ("RCRA") or having characteristics that may subsequently be considered under RCRA to constitute a hazardous waste; (iv) substance containing petroleum, as that term is defined in Section 9001(8) of RCRA; (v) toxic pollutant that is or may be listed under Section 307(a) of FWPCA; (vi) hazardous air pollutant that is or may be listed under Section 112 of Clean Air Act, as amended (42 U.S.C. §§ 7401, 7412); (vii) imminently hazardous chemical substance or mixture with respect to which action has been or may be taken pursuant to Section 7 of the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601, 2606); (viii) source, special nuclear, or by-product material as defined by the Atomic Energy Act of 1954, as amended (42 U.S.C. § 2011 et seq.); (ix) asbestos, asbestos-containing material, or urea formaldehyde or material that contains it; (x) waste oil and other petroleum products; and (xii) any other toxic materials, contaminants, or hazardous substances or wastes pursuant to any Legal Requirement.

    C.    Which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise dangerous to human health or the environment and is or becomes regulated by any governmental authority, agency, department, commission, board, agency or instrumentality of the United States, the State of Louisiana or any political subdivision thereof.

x.    "Legal Requirements" means all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations (proposed or promulgated), permits, licenses, certificates, authorizations, restrictions and requirements of all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, foreseen or unforeseen, ordinary or extraordinary, which now or at any time hereafter are applicable to the Premises or Motor Fuel Operations, or any use or condition of the Premises or Motor Fuel Operations, including without limitation, all applicable building codes and zoning requirements.

xi.    "Litigation Expenses" means and includes, among other things, all of the following arising as a result of default: (a) legal expenses; (b)accounting expenses; (c) expert expenses; and (d) all court costs and expenses.

**19.  RIGHT TO OFFSET.**  The Dealer expressly agrees to the following:

    a.    Any monies due by Dealer under this Agreement, if unpaid, shall be assessed a monthly interest of one half percent (1 $\frac{1}{2}$%) per month until paid.

    b.    In the event Distributor is forced to place insurance on behalf of Dealer in order to comply with all Dealer insurance requirements provided for under this Agreement, the cost of said insurance shall be paid for by Dealer upon demand, and Dealer hereby authorizes Distributor to EFT Dealer's account for said cost without any further notice or demand.

5

c.  In the event Distributor incurs any damages or otherwise is forced to expend monies on behalf of Dealer in order to ensure compliance with any Dealer obligations required under this Agreement, such expenses shall be paid for by Dealer upon demand, and Dealer hereby expressly authorizes Distributor to offset these amounts against any Dealer Commission payable without any further notice or demand.

20. **INDEMNIFICATION.**

a.  Dealer, to the maximum extent permitted by law, shall protect, defend, indemnify and hold Distributor and its employees (including attorney fees and cost of legal assistance) free and harmless from and against any and all losses, claims, liens, and causes of action of every kind, including the amount of any judgments, penalties, interest, court costs and legal expenses (i.e., attorneys' fees and costs of legal assistants) incurred by Distributor in defense of same, arising in favor of any party on account of claims, liens, debts, personal injury, death or damages to property and all other claims or demands of every character occurring or in any way incident to, in connection with or arising out of the conduct of Dealer's Store Operations or Dealer's Motor Fuel Operations, or with the performance, acts or omissions by any consumers served by Dealer (including employees, agents, contractors and invitees of Dealer and Dealer's consumers). Dealer shall be solely responsible for the defense of any and all claims, demands or suits and agrees to bear all other costs related thereto. Dealer's obligations hereunder expressly extend to all pollution cleanup and response costs, claims and demands by any party, including governmental agencies, arising out of any underground storage tank leaks or groundwater contamination, excepting any pollution or environmental claims and demands arising from or related to the negligence or willful misconduct of Distributor. As used herein, "pollution cleanup and response costs" include, but are not limited to, costs of testing, costs of site rehabilitation and other costs for the cleanup of discharge of petroleum products.
b.  Dealer shall be responsible for maintaining in force during the term of this Agreement all insurance required under the Agreement and as required by law. Such insurance will in no way limit or restrict Dealer's obligations under this Section to indemnify Distributor, and further, the insurance will be in no way be limited by any limitation placed upon the indemnity herein given as matter of law.

21. **INCORPORATION OF AGREEMENT TERMS.** In conjunction with the execution of this Agreement, Distributor and Dealer have entered into Ancilliary Agreements with regard to the Premises. A breach of an Ancilliary Agreement shall be considered a breach of this Agreement, and the termination of an Ancilliary Agreement shall be deemed a termination of this Agreement.

22. **NOTICE.** Any notice required hereunder ("Notice") shall be in writing and shall be deemed served to the other party either when personally delivered to the other party, or when mailed via certified mail to the other party at the address first set forth herein above, unless a more recent address has been received.

23. **DEFAULTS.** Each of the following shall constitute an event of default ("Default"):

a.  The Distributor or Dealer fail to keep, perform, observe and/or comply with any promise, covenant, term, condition and obligation under this Agreement or any Ancilliary Agreement;
b.  The Dealer becomes insolvent, or shall take the benefit of any present or future insolvency statute, makes a general assignment for the benefit of creditors, consents to the appointment of a receiver, trustee, or liquidator of all or substantially all of its property, or files a petition in bankruptcy or is adjudged bankrupt.
c.  The Dealer fails to timely pay any monies when due with regard to this Agreement or any Ancilliary Agreement;
d.  The termination by either party or both parties of an Ancilliary Agreement, in which case this Agreement shall also terminate upon the same terms and the same time.

24. **TERMINATION.** Upon an event constituting a Default, and such Default continues uncured for a period of five (5) days after written notice of such Default, then:

a.  If the Dealer is the party in Default, then the Distributor may at its option to choose all or just one of the following:
    i.   Recover any delinquent monies or payments due under this Agreement, together with all interest due thereon;
    ii.  Correct or resolve an event of Default in which event Distributor retains the option of debiting the Dealer's Commissions or collecting the costs to cure from the Dealer;
    iii. Seek any other appropriate legal or equitable remedy, including but not limited to injuctive relief, specfic performance or damages.

25. **MISCELLANEOUS.**

a.  **Cumulative Rights.** The remedies of both parties hereunder shall be deemed cumulative and no remedy of either party, whether exercised or not, shall be deemed to be in exclusion of any other.
b.  **No Waiver.** The Dealer agrees that in the performance of this Agreement and the terms, covenant, and conditions hereunder, time shall be of the essence and that Distributor's acceptance of partial or delinquent payments or performance hereunder, or failure by Distributor to exercise any right or remedy shall not constitute a waiver of any obligation or performance of Dealer or right of Dealer or a waiver of any other similar or subsequent default or failure. Unless otherwise expressly agreed to in writing duly executed in conformity with the provisions contained here within and, if for any reason Distributor shall refrain on any occasion or series of occasions, from instituting legal action in connection with any past, existing or threatened breach hereof, or if in any one instance or more Distributor shall fail to exercise any right or privilege herein conferred, or shall not require conformance to any limitation, or shall not insist upon the performance of any of the terms and conditions of this agreement, such failure shall not be construed as a waiver thereof and shall not be taken or held to affect the right of Distributor at any time thereof and shall not be taken or held to affect the right of Distributor at any time thereafter to enforce and avail itself of ever such right and privilege, limitation, term, or condition.

6

c.  **Assignment & Subletting.** Distributor reserves the right to assign this Agreement without the consent of the Dealer. Dealer may not assign this Agreement without the prior express written consent of the Distributor. This Agreement shall be binding upon the heirs, successors and assigns of the parties.

d.  **Attorneys' Fees and Expenses.** In the event Distributor is required to discharge any obligation of Dealer required hereunder, pay any taxes, liens, interest, or pay for any repairs, maintenance, upkeep or other debt or obligation of Dealer required hereunder, or shall be required to expend sums for the enforcement of this Agreement or protection of Dealer's rights created by this Agreement, or take such action to protect any intellectual property owned by Distributor or Distributor's suppliers, or take such further action deemed by the Distributor necessary to protect Distributor's Motor Fuel Operations, Distributor shall be entitled to reimbursement for all sums so expended including, but not limited to, attorney's fees (including costs of legal assistants) and court costs. All sums so expended shall bear interest from the date of payment at a rate of one half percent (1 ¹/₂%) per month.

e.  **No Agency Relationship.** Nothing in this Agreement shall be construed as reserving or granting to Distributor any right to exercise control over or direct the day-to-day conduct to management of Dealer's business. Dealer is an independent contractor for these purposes, subject to the obligations set forth herein for Dealer to provide specific work and services to Distributor. Dealer shall have not authority to make any contracts or representations whatsoever in the name of or in behalf of Distributor. Dealer shall not be deemed an employee of Distributor, nor shall Dealer's employees be deemed employees of Distributor, as the term "employee" has traditionally been defined under the common law or State of Louisiana or by the rulings and regulations of the Internal Revenue Service. It is the intent of the parties that the relationship between Distributor and Dealer (including any of Dealer's employees, agents, customers, visitors, invitees, guests, contractors, subcontractors, licensees, or any other person(s) whomsoever, in connection with this Agreement) is that of independent contracting parties, and is not, and shall not be deemed to be, any other relationship, including without limitation that of joint venturers, partners, agents or principal-agents.

f.  **Severability.** If, for any reason, any provision in this Agreement shall not be authorized by law or shall be deemed void for public policy reasons or otherwise, then that provision shall be severable from the remaining provision which shall continue in full force and effect.

g.  **Entire Agreement.** This Agreement represents the entire agreement between the parties and cancels and supersedes any previous agreements with respect to Motor Fuel Operations between the parties. Any and all amendments and modifications to same shall be in writing and executed by both parties.

h.  **Counterparts.** This Agreement may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

i.  **Governing Law.** This Agreement shall be deemed to be negotiated, executed and performed under the laws of the State first mentioned hereinabove and all disputes related to this Agreement, whether past, present or future, shall be governed by and construed under that state's said laws.

j.  **Interpretation.** Should any provision of this Agreement require judicial interpretation, Dealer and Distributor hereby agree and stipulate that the court interpreting or considering same shall not apply the presumption that the terms hereof shall be more strictly construed against a party by reason of any rule or conclusion that a document should be construed more strictly against the party who itself or through its agent prepared the same, it being agreed that all parties hereto have participated in the preparation of this Agreement and that each party had full opportunity to consult legal counsel of its choice before the execution of this Agreement.

k.  **Headings.** The section headings contained in this Agreement are for convenience only and shall not enlarge or limit the scope or meaning of the various and several sections hereof. Words in the singular number shall be held to include the plural, unless the context otherwise requires.

l.  **Authority to Contract.** Each party hereto warrants, represents and covenants that it has full, unfettered legal right, power and authority to execute and deliver this Agreement.

m.  **Force Majeure.** Distributor shall not be liable to Dealer for compensation, loss or damage due to any delay or failure by Distributor to furnish motor fuel with respect to Motor Fuel Operations due to any delay or failure for failure to perform this Agreement when such, failure is due to "force majeure." "Force Majeure" shall mean acts of God, the common enemy or circumstances beyond the reasonable control of the person claiming the same, including but not limited to earthquakes, fire, flood, malicious mischief, strikes, lockouts, boycotts, picketing, labor disturbances or industrial disputes or disturbances, civil disturbances, arrests and restraints, interruptions by government or court orders, present an future valid orders of any regulatory body having proper jurisdiction, acts of the public enemy, wars, riots, insurrection inability to secure labor or inability to secure materials, including inability to secure materials by reason of allocations promulgated by authorized governmental agencies, epidemics, fires explosions, breakage or accident to machinery or lines of pipe, freezing of wells, or pipelines, inability to obtain easements, right-of-way, or other interest in realty, the making of repairs, replacements, or alterations to lines of pipe or plants, partial or entire failure of gas supply or demand over which neither Distributor's supplier nor Distributor have reasonable control, or any other cause, whether of the kind herein enumerated or otherwise, not reasonably within the control of the party claiming "force majeure." Events of "force majeure" shall, so far as possible, be remedied with all reasonable dispatch. The settlement of industrial difficulties shall be within the discretion of, the party having the difficulty, and the requirement that "force majeure" be remedied with all reasonable dispatch shall not require the settlement of industrial difficulties by acceding to the demands of any opposing party when such course is inadvisable in the discretion of the party having the difficulty. Whenever such causes in Distributor's judgment require restriction of deliveries, Distributor reserves the right in its discretion to restrict deliveries to Dealer without liability, and Dealer may thereupon obtain a suitable temporary replacement supply in such case of force majeure, but only on an emergency basis and until such time as Distributor may recommence deliveries.

n.  **Limitation of Damages.** Unless expressly provided for herein, neither party hereto shall be liable for any indirect, special, incidental, consequential or punitive damages whether under tort, contract strict liability, statute or otherwise.

**THUS DONE AND SIGNED** in the presence of the undersigned competent witnesses after due reading of the whole Agreement, the parties hereto have caused this Agreement to be executed pursuant to the appropriate authority duly given on the date first mentioned above

**DEALER:**

By: _Tollwen Ntemahaw Holding Corp._

Title: _CEO Micheal Kellner_

**WITNESSES:**

_William . Mcfarland_

Print Name: _____

_____

Print Name: _____

**DISTRIBUTOR**

By: _To_

Title: Herb Stathes, President
      Hill City Oil Company, Inc.

**WITNESSES:**

_____

Print Name: _____

_____

Print Name _JAK Kinstion_

8

## JUBILEE PROPRIETARY MARK AGREEMENT

**THIS PROPRIETARY MARK AGREEMENT** (the "Mark Agreement") is made and entered into on the 12 day of _____July_____, 20 06 ("Effective Date") by and between **Hill City Oil Company, Inc.**, a Mississippi corporation, whose address is 1409 Dunn Street, Houma, LA 70360 ("Grantor"); and **Tolliver International Holding Corp.**, represented by William McFarland, Michael Tolliver and Vincent Tolliver,, whose address is _PO Box 67 Mmmmv LA_ ("Grantee"), who for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby agree as follows:

### RECITALS

**WHEREAS,** Grantee operates a convenience store business upon the Premises, as hereinafter defined, at which location Grantee will exclusively sell Grantor's motor fuels on a consignment basis ("Grantee's Motor Fuel Operations"); and

**WHEREAS,** Grantees also operates a convenient store business, and retail consumer sales, rentals and/or services made or performed upon the Premises ("Grantee's Store Operations") with Grantee's Store Operations being separate, apart and distinct from Grantor's Motor Fuel Operations and Grantee's Motor Fuel Operations (hereinafter they shall collectively be referred to as "Motor Fuel Operations"); and

**WHEREAS,** Grantor currently engages in, among other things, the supply of branded and unbranded motor fuel for retail sale to consumers ("Grantor's Motor Fuel Operations"); and

**WHEREAS,** Grantor owns certain trade names, service marks, trade dress, trademarks, logos, emblems and indicia or origin, including without limitation the name and mark "Jubilee," "Jubilee Food Store," "Ride U.S.A.," and such other names, marks, logos, emblems, and indicia as Grantor may from time to time use in connection with the supply of motor fuel (hereinafter collectively referred to as "Proprietary Mark"); and

**WHEREAS,** Grantor and Grantee acknowledge that in connection with this Mark Agreement they may have also executed, among other things, a Motor Fuel Sales Management Agreement and/or Motor Fuel Sales Agreement and/or Lease Agreement (hereinafter collectively "Ancillary Contracts"); and

**NOW THEREFORE,** for and in consideration of the mutual covenants herein, the parties agree to the following:

1. **GRANT.**
   a. By this Mark Agreement, Grantor agrees to permit Grantee to use its Proprietary Mark in connection with Grantee's retail sale of motor fuel at the following location: **1001 Broadway, Delhi, Louisiana** (the "Premises").
   b. In exchange, Grantee agrees that Grantor shall be the exclusive supplier of motor fuel to Grantee's Motor Fuel Operations. Grantee also agrees to exclusively use the Proprietary Mark in connection with Grantee's Store Operations and Grantee's Motor Fuel Operations (hereinafter collectively "Grantee's Jubilee Branded Business Operations").
   c. This Mark Agreement does not preclude Grantor from granting to others the right to use the Proprietary Mark, regardless of the market or geographic area and regardless of whether such grant competes, directly or indirectly, with Grantee or Grantee's Jubilee Branded Business Operations.
   d. Nothing herein shall be construed as Grantor in fact or being obligated to extend any credit to Grantee. If grantor, in its sole discretion, does elect to extend credit to Grantor, such extension of credit shall be made only in writing.
   e. Nothing herein shall be construed as Grantor conveying the right to Grantee to alter or change the Proprietary Mark, including but not limited to use of a derivative name.

2. **BRAND IDENTIFICATION.**
   a. Grantee acknowledges and agrees that Grantee's Motor Fuel Operations upon Premises shall be operated under the name of either **"Jubilee"** or **"Ride U.S.A."** and Premises used in connection with Grantee's Motor Fuel Operations accordingly shall bear this logo exclusively.
   b. Grantee acknowledges and agrees that Grantee's Store Operations upon Premises shall be operated under the name of **"Jubilee"** or **"Jubilee Food Store,"** and that Grantee's Store Operations shall bear these logos exclusively. Grantee further agrees to attend all Jubilee Food Store meetings, to require all of its employees, including the Grantee itself, to wear appropriate uniform, as approved by Grantor, while on duty, and to participate in all promotional activities and advertising sponsored by the Grantor.
   c. Grantee acknowledges that the operation of Grantee's Jubilee Branded Business Operations impacts the customers' perception and overall acceptance of the Proprietary Mark. Accordingly, Grantee shall operate its Jubilee Branded Business Operations in compliance with Grantor's requirements for said operations as set out from time to time by Grantor and at all times in compliance with this Mark Agreement.
   d. Grantor retains exclusive authority with regard to the nature, extent and scope of Grantee using Jubilee Food Store cups, lids, signs and packages and Grantee's participation in training and incentive programs offered by the Grantor or Grantor's suppliers.
   e. Grantee acknowledges that it will keep the Premises free of dirt and debris and will maintain a high level of cleanliness on the Premises and both inside and outside the store, so as not to detract from the image that Grantor is trying to project with regard to the Proprietary Mark.
   f. If Grantee fails to comply with this Mark Agreement or Grantor's requirements hereunder, Grantor may require Grantee to stop operating Grantee's Jubilee Branded Business Operations and may also withdraw its approval for the use of the Proprietary Mark.

3. **JUBILEE CREDIT CARD.**

   a. **Authorized Jubilee Credit Card Transactions:**

      i. Grantor grants to Grantee and Grantee's Jubilee Branded Business Operations the privilege of honoring, and Grantee's Jubilee Branded Business Operations shall accept and honor, valid Jubilee Credit Cards or other valid credit or debit cards, if any, authorized by Grantor from time-to-time (collectively "Branded Credit Cards") for all products (including convenience store merchandise, food service, and motor fuel products) and services customarily offered at retail facilities to the motoring public and all services offered by Grantee with respect to Grantee's Jubilee Branded Business Operations. Grantee shall be responsible for any breaches by it or Grantee's employees of this Mark Agreement or instructions by Grantor.

      ii. Credit cards other than the Jubilee Credit Card may be honored, provided they are in accordance with this Agreement and the Ancillary Agreements.

      iii. Grantor reserves the right to revoke the privilege of Grantee honoring Jubilee Credit Cards at any time.

   b. **Jubilee Credit Card Administration:**

      i. At the election of Grantor, all of Grantee's Jubilee Credit Card sales shall be processed electronically. However, Credit Card transactions may be manually processed in the following instances:

         a. A credit card cannot be electronically processed because of physical defect such as a defective or missing magnetic strip;

         b. Transactions processed during a temporary "down-time" of the point of sale equipment for reasons including, without limitation, hardware or software problems, loss of communications, and power outages; or

         c. When instructed by the point of sale equipment to use the manual imprinter.

      ii. At the election of Grantor, all of Grantee's Jubilee Credit Card sales shall be processed exclusively by a credit card system selected by Grantor, Grantor's credit card system, or by Grantee's merchant processor. Furthermore, in the event that a satellite credit card system is selected by Grantor, Grantee shall be required to use same and to pay for all related charges and fees. Grantor agrees that such charges will be reasonable as defined by normal and customary industry charges.

   c. **Processing Jubilee Credit Card Transactions:**

      i. Grantee shall make sales of products and services with respect to Grantee's Jubilee Branded Business Operations to persons presenting a valid Jubilee Credit Card in which case Grantee shall comply with the instructions, policies and restrictions set forth herein as well as any Jubilee Credit Card program guidelines developed by Grantor, as amended from time to time. Grantee acknowledges that it has received a copy of these guidelines. Grantee understands that its failure to comply with the instructions, policies or restrictions set forth in the guidelines will result may result in the refusal by Grantor or Grantor's merchant to accept Jubilee Credit Card invoices and/or to charge back to Grantee any such deficient Jubilee Credit Card invoices. GRANTEE UNDERSTANDS AND AGREES THAT IT SHALL BE EXCLUSIVELY RESPONSIBLE FOR ALL CHARGE BACKS.

      ii. Grantee acknowledges that it must obtain an authorization number for each Jubilee Credit Card transaction that it accepts.

      iii. All Jubilee Credit Card chargebacks authorized hereunder, or by an Ancillary Agreement, shall be paid to Grantor via electronic fund transfer ("EFT") or other method as designated from time to time by Grantor in its sole discretion. Grantor shall have the right to charge back to Grantee's account, within six (6) months of the date of sale or within six (6) months of submittal, whichever is later, the face value or any portion thereof, any chargeback claimed against Grantor.

      iv. Grantor retains the right to implement any and all fraud prevention measures as Grantor in its sole discretion deems necessary, which shall include but not be limited to, chargeback rights, purchase restrictions, card restrictions, card reader in dispenser restrictions, training, penalties, fines and other assessments.

      v. All uncollectable credit card transaction and/or credit card charge-backs shall be the sole responsibility of Grantee. On a bi-weekly basis, any surplus shall be transferred to Grantor's account by EFT transfer.

      vi. All uncollectable Jubilee Credit Card transaction and/or Jubilee Credit Card charge-backs shall be the sole responsibility of Dealer. On a bi-weekly basis, any surplus shall be transferred to Grantor's account by EFT transfer.

   d. **Jubilee Credit Card Records:** Grantee shall be responsible for retaining all sales reports and records, whether paper or electronic, with regard to Jubilee Credit Card sales, which must be remitted daily to Grantor.

4. **DEFAULTS.** Each of the following shall constitute an event of default ("Default"):

   a. The Grantor or Grantee fail to keep, perform, observe and/or comply with any promise, covenant, term, condition and obligation under this Mark Agreement or any Ancillary Agreements;

   b. The Grantee becomes insolvent, or shall take the benefit of any present or future insolvency statute, makes a general assignment for the benefit of creditors, consents to the appointment of a receiver, trustee, or liquidator of all or substantially all of its property, or files a petition in bankruptcy or is adjudged bankrupt.

   c. The Grantee fails to timely pay any monies due hereunder or with respect to any Ancillary Contracts, when due;

   d. The termination by either party or both parties of any Ancillary Agreements, in which case this Mark Agreement shall also terminate upon the same terms and the same time.

5. **TERMINATION.** Upon an event constituting a Default, and such Default continues uncured for a period of five (5) days after written notice of such Default, then:

   a. If the Grantee is the party in Default, then the Grantor may, at its option to choose all or just one of the following:

       i.    Recover any delinquent monies or payments due under this Mark Agreement, together with any applicable interest due thereon;

      ii.    Correct or resolve an event of Default, including but limited to taking all necessary action to correct the Default and to maintain and preserve the Proprietary Mark;

     iii.    Terminate this Mark Agreement, in which event Grantee shall immediately surrender the Proprietary Mark, and any indicia, signs, logos, etc. in connection with the Proprietary Mark, to Grantor and Grantor shall be entitled to enter upon the Premises and otherwise take possession of the Proprietary Mark, all without further notice or demand. This right shall also include the right of Grantor to have and recover all of damages and losses to Grantor arising out of the Default from the Grantee.

     iv.    Seek any other appropriate legal or equitable remedy, including but not limited to injunctive relief, specific performance or damages.

    b.    If the Grantor is the party in default, then Grantee may, at its option:

       i.    Recover all of its damages and losses arising out of such Default and recover all of its damages and losses arising out of such default from the Grantor .

      ii.    Terminate this Mark Agreement, which shall including the right to have and recover all of its damages and losses arising out of the Default from the Grantor, upon thirty (30) days additional notice of intent to terminate being given to the Grantor unless the Grantor cures such default and pays to the Grantee all losses and damages incurred by the Grantee prior to the expiration of such additional thirty (30) day period.

6.   **NOTICES.** Any notice required hereunder ("Notice") shall be in writing and shall be deemed served to the other party either when personally delivered to the other party, or when mailed via certified mail to the other party at the address first set forth herein above, unless a more recent address has been received.

7.   **MISCELLANEOUS.**

    a.    **Cumulative Rights.** The remedies of both parties hereunder shall be deemed cumulative and no remedy of either party, whether exercised or not, shall be deemed to be in exclusion of any other.

    b.    **No Waiver.** Grantee agrees that in the performance of this Mark Agreement and the terms, covenant, and conditions hereunder, time shall be of the essence and that Grantor's acceptance of partial or delinquent payments or performance hereunder, or failure by Grantor to exercise any right or remedy shall not constitute a waiver of any obligation or performance of Grantee or right of Grantor or a waiver of any other similar or subsequent default or failure.

    c.    **Assignment & Subletting.** Grantor reserves the right to assign this Mark Agreement and/or the Proprietary Mark without the consent of the Grantee. It is within Grantor's sole discretion with regard to whether Grantee may assign this Mark Agreement. As such, Grantee may not assign, grant or otherwise allow the use or operation of the Proprietary Mark, including exercise of any rights related thereto, to any third party, subsidiary, affiliate or other person without the prior written consent of Grantor, which remains in the sole discretion of Grantor, and, then, only if Grantor has (i) expressly approved branding of said third party, subsidiary, affiliate or other person, and (ii) an exclusive Mark Agreement for the provision of motor fuel third party, subsidiary, affiliate or other person. This Mark Agreement shall be binding upon the heirs, successors and assigns of the parties.

    d.    **Attorneys' Fees and Expenses.** In the event Grantor shall be required to discharge any obligation of Grantee required hereunder, pay any taxes, liens, interest, or other debt or obligation of Grantee required hereunder, or take such further action deemed by the Grantor necessary to protect the Proprietary Mark and Grantor's interest therein due to the intentional or negligent actions of Grantee, Grantor shall be entitled to reimbursement for all sums so expended including, but not limited to, attorney's fees (including costs of legal assistants) and court costs. All sums so expended shall bear interest from the date of payment at a rate of one half percent (1 $^{1}/_{2}$%) per month.

    e.    **No Agency Relationship.** Nothing contained in this Mark Agreement is intended or shall be construed as reserving or granting to Grantor any right to exercise control over or to direct the conduct or management of Grantee's business conducted on the Premises. To the contrary, the entire control and direction of Grantee's business operations shall be vested in the Grantee. Grantee shall have no authority to contract for Grantor or make any commitment whatsoever in the name of or on behalf of Grantor. The relationship between Grantor and any of Grantee's employees, agents, customers, visitors, invitees, guests, contractors, subcontractors, licensees, or any other person(s) whomsoever, in connection with this Mark Agreement is that of independent contracting parties, and is not, and shall not be deemed to be, any other relationship, including without limitation that of joint venturers, partners, or principal-agents.

    f.    **Severability.** If, for any reason, any provision in this Mark Agreement shall not be authorized by law or shall be deemed void for public policy reasons or otherwise, then that provision shall be severable from the remaining provision which shall continue in full force and effect.

    g.    **Entire Agreement.** This Mark Agreement represents the entire agreement between the parties and cancels and supersedes any previous agreements with regard to the use by Grantee of the Proprietary Mark. Any and all amendments and modifications to same shall be in writing and executed by both parties.

    h.    **Counterparts.** This Mark Agreement may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

    i.    **Governing Law.** This Mark Agreement shall be deemed to be negotiated, executed and performed under the laws of the Louisiana and all disputes related to this Mark Agreement, whether past, present or future, shall be governed by and construed under said law.

    j.    **Interpretation.** Should any provision of this Mark Agreement require judicial interpretation, Grantor and Grantee hereby agree and stipulate that the court interpreting or considering same shall not apply the presumption that the terms hereof shall be more strictly construed against a party by reason of any rule or conclusion that a document should be construed more strictly against the party who itself or through its agent prepared the same, it being agreed that all parties hereto have participated in the preparation of this Mark Agreement and that each party had full opportunity to consult legal counsel of its choice before the execution of this Mark Agreement.

k. **Headings.** The section headings contained in this Lease are for convenience only and shall not enlarge or limit the scope or meaning of the various and several sections hereof. Words in the singular number shall be held to include the plural, unless the context otherwise requires.

l. **Authority to Contract.** Each party hereto warrants, represents and covenants that it has full, unfettered legal right, power and authority to execute and deliver this Mark Agreement.

m. **Limitation of Damages.** Unless expressly provided for herein, neither party hereto shall be liable for any indirect, special, incidental, consequential or punitive damages whether under tort, contract strict liability, statute or otherwise.

**THUS DONE AND SIGNED** in the presence of the undersigned competent witnesses after due reading of the whole Mark Agreement, the parties hereto have caused this Mark Agreement to be executed pursuant to the appropriate authority duly given on the date first mentioned above.

GRANTOR:

By:

Title:

WITNESSES:

Print Name:

Print Name:

GRANTEE:

By: _Tolliver International Holding Corp_

Title: _CEO Michral A Tolliver_

WITNESSES:

Print Name:

Print Name

4